613 S.E.2d 795

**Donna C. MARTASIN, Personal Representative of the Estate of Edwin S. Martasin, Deceased, for the benefit of the heirs at law, Donna C. Martasin, Kenneth E. Martasin, and Jerald A. Martasin, Appellants,**

v.

**HILTON HEAD HEALTH SYSTEM, L.P.; Amisub (Hilton Head), Inc.; Tenet Physician Services, Hilton Head, Inc.; Hilton Head Health System, L.P., Amisub (Hilton Head), Inc., Tenet Physician Services Hilton Head, Inc., d/b/a Hilton Head Medical Center & Clinics; Urgent Care Center of Hilton Head Medical Center & Clinics; Gerald E. Vanderpool, M.D.;**

Christina S. Gwozdz, M.D.;  Paul M. Long, M.D.;  Frank L. Hart, M.D.;  Kenneth C. Kunze, M.D.;  Gary W. Thomas, M.D.; Charles T. Lucas, M.D., Defendants, Of Whom Hilton Head Health System, L.P., Tenet Physician Services Hilton Head, Inc., d/b/a Hilton Head Medical Center & Clinics;  Urgent Care Center of Hilton Head Medical Center & Clinics;  Paul M. Long, M.D.;  Frank L. Hart, M.D.;  and Gary W. Thomas, M.D. are the, Respondents.

No. 3984.

Court of Appeals of South Carolina.

Heard Jan. 13, 2005.

Decided May 2, 2005.

Rehearing Denied June 22, 2005.

432

H. Fred Kuhn, Jr., of Beaufort, for Appellant.

E. Douglas Pratt–Thomas, Francis M. Ervin, II, J. Rutledge Young, Jr., Stephen L. Brown, John K. Blincow, Jr., R. Gerald Chambers, Jr., Robert H. Hood, Robert H. Hood, Jr., and Deborah H. Sheffield, all of Charleston, for Respondents.

KITTREDGE, J.

Donna C. Martasin (Mrs. Martasin) brought wrongful death and conscious pain and suffering claims against three physicians (and related corporate health care entities), alleging they committed medical malpractice in negligently failing to treat and prevent the fatal side effects of a cancer treatment administered to her husband, Edwin S. Martasin (Mr. Martasin).  At trial, the circuit court entered a directed verdict in favor of all the defendants on the grounds Mrs. Martasin failed to present sufficient evidence to prove to a reasonable degree of medical certainty that the alleged negligence "most probably" caused her husband's death—the required burden of proof in such medical malpractice cases.  We affirm the directed verdict as to Defendant Dr. Frank L. Hart and reverse with respect to Defendants Dr. Paul M. Long and Dr. Gary W. Thomas.  Additionally, we reverse the circuit court's grant of a directed verdict on Mrs. Martasin's claim for punitive damages.

## FACTS/PROCEDURAL HISTORY

### Mr. Martasin's Disease and Medical Treatment

This appeal concerns the medical treatment Mr. Martasin received from the three defendant physicians (respondents here) during the time immediately after he was initially diagnosed with a form of blood cancer leukemia.  The relevant undisputed facts are as follows.

On Monday, December 4, 1995, Mr. Martasin sought treatment at the emergency room of Hilton Head Hospital for persistent headaches, fever, and fatigue.  Mr. Martasin was examined by Dr. Paul Long, an internal medicine specialist.

After his initial examination, Dr. Long decided to admit Mr. Martasin to the hospital for further tests. Based on the initial test results, Dr. Long suspected Mr. Martasin had some form of the blood cancer leukemia. Dr. Long called in Dr. Gary Thomas, an oncologist, for consultation. Dr. Thomas examined Mr. Martasin and performed additional tests. Dr. Thomas concluded that Mr. Martasin's clinical presentation was consistent with leukemia. The doctors ordered more sophisticated blood tests to confirm the diagnosis.

On Thursday, December 7, 1995, Dr. Thomas determined that Mr. Martasin should immediately begin a course of treatment to counteract the effects of the cancer. Mr. Martasin was given a prescription for the drug Prednisone to be taken daily. Later that day, he was discharged from the hospital with instructions to return to see Dr. Thomas the following Monday, December 11th. Mr. Martasin left the hospital, filled the prescription for the Prednisone, and took the medication as instructed.

While Mr. Martasin was at home, the doctors arranged for a home health care nurse to check in on him each day. When the nurse visited on Saturday, December 9th, Mr. Martasin's condition had noticeably worsened. The nurse paged Dr. Long, who responded by telephone, speaking directly with Mrs. Martasin. Dr. Long declined to see Mr. Martasin that day, but he instructed Mrs. Martasin to take her husband back to the emergency room where Dr. Frank Hart, Dr. Long's medical practice associate, would meet them. At the hospital, Dr. Hart examined Mr. Martasin and performed blood, urine and other tests. Dr. Hart informed Mr. Martasin that the examination and laboratory test results did not indicate a change in his condition that would warrant readmitting him to the hospital. Dr. Hart instructed the Martasins to return home and to keep their appointment with Dr. Thomas scheduled for the following Monday.

When Mr. Martasin returned for his Monday appointment, Dr. Thomas found his condition had deteriorated substantially since his initial discharge from the hospital. That evening, Mr. Martasin was transferred to the Intensive Care Unit at the Medical University of South Carolina, where he lapsed into unconsciousness and died the next morning, December 12.

Dr. Lawrence Afrin, an oncologist at MUSC who examined Mr. Martasin, concluded Mr. Martasin was suffering from a condition known as "Tumor Lysis Syndrome" (TLS) when he arrived at MUSC. Furthermore, the pathologist who performed the autopsy on Mr. Martasin reported that her findings as to the cause of death were clinically consistent with TLS.

As described in the undisputed portions of the medical testimony, TLS is a serious, yet predictable, complication that arises when treating cancer with certain medications. Treatments such as Prednisone work to attack the cancer cells in the body. As the dead cells are broken down by the body, the chemicals in the cells are released into the bloodstream. TLS occurs when these chemical by-products are released in quantities that overwhelm the body's ability to restore the proper chemical balance in the blood. If a patient is at risk of TLS, the treating physician can prescribe certain prophylactic measures that will flush out the harmful chemicals in the bloodstream and aid the body in regulating the chemical balance in the blood. Failure to properly institute these prophylactic measures can lead to the death of a patient suffering from TLS.

### This Action

As personal representative of her husband's estate, Mrs. Martasin filed suit against Dr. Long, Dr. Thomas, and Dr. Hart, as well as the physicians' medical practices, alleging they were negligent in failing to treat and prevent the side effects of Mr. Martasin's TLS. At trial, Mrs. Martasin offered expert testimony to establish the negligence of these physicians proximately caused the death of her husband. At the close of the evidence, all three doctors moved for a directed verdict claiming the expert testimony failed to establish that the alleged deviation from the standard of care proximately caused Mr. Martasin's death to "a reasonable degree of medical certainty." The circuit court granted the motion for directed verdict with respect to all three doctors and the corresponding corporate defendants, finding Mrs. Martasin did not establish the conduct of the doctors "most probably" resulted in the death of Edwin Martasin. Also, the circuit

court directed a verdict denying Mrs. Martasin's claim for punitive damages. This appeal followed.

## STANDARD OF REVIEW

When ruling on a motion for directed verdict, the court must view the evidence and the inferences that can reasonably be drawn therefrom in the light most favorable to the nonmoving party. *Sabb v. South Carolina State Univ.*, 350 S.C. 416, 427, 567 S.E.2d 231, 236 (2002). If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and the motion should be denied. *Adams v. G.J. Creel & Sons, Inc.*, 320 S.C. 274, 277, 465 S.E.2d 84, 85 (1995); *Bailey v. Segars*, 346 S.C. 359, 365–66, 550 S.E.2d 910, 913 (Ct.App.2001). However, this rule does not authorize submission of speculative, theoretical, and hypothetical views to the jury. *Hanahan v. Simpson*, 326 S.C. 140, 149, 485 S.E.2d 903, 908 (1997).

## LAW/ANALYSIS

### I. Directed Verdict On Negligence Claims

The primary issue in this appeal is whether Mrs. Martasin presented sufficient evidence to establish the defendant physicians breached the applicable standard of care and that breach proximately caused her husband's death. To prove these critical components of her negligence claim, Mrs. Martasin relied on the testimony of medical experts, particularly the testimony of Dr. Mansoor N. Saleh. After careful review of the evidentiary record, especially Dr. Saleh's testimony, we find there is sufficient evidence for a reasonable jury to conclude the alleged acts of Dr. Long and Dr. Thomas in treating Mr. Martasin deviated from the standard of care and were a proximate cause of the death of Mr. Martasin. The directed verdict granted in favor of these two physicians, therefore, should not have been granted. We reach a different conclusion with regard to Dr. Hart. Viewing the evidence as a whole, we are unable to find sufficient evidence to establish any act or omission by Dr. Hart proximately caused Mr. Martasin's death. The directed verdict in favor of Dr. Hart shall, therefore, stand.

■■■■■ A plaintiff in a medical malpractice case must establish by expert testimony both the standard of care and the defendant's failure to conform to the required standard, unless the subject matter is of common knowledge or experience so that no special learning is needed to evaluate the defendant's conduct. *Gooding v. St. Francis Xavier Hosp.*, 326 S.C. 248, 254, 487 S.E.2d 596, 599 (1997). "In addition to proving the defendant negligent, the plaintiff must also prove that the defendant's negligence was a proximate cause of the plaintiff's injury." *Carver v. Med. Soc'y of S.C.*, 286 S.C. 347, 350, 334 S.E.2d 125, 127 (Ct.App.1985). Our supreme court has articulated the burden of proof borne by plaintiffs in proving proximate cause in medical malpractice cases:

> Negligence is not actionable unless it is a proximate cause of the injury complained of, and negligence may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided. When one relies solely upon the opinion of medical experts to establish a causal connection between the alleged negligence and the injury, the experts must, with reasonable certainty, state that in their professional opinion, the injuries complained of *most probably* resulted from the defendant's negligence. The reason for this rule is the highly technical nature of malpractice litigation. Since many malpractice suits involve ailments and treatments outside the realm of ordinary lay knowledge, expert testimony is generally necessary.

*Ellis v. Oliver*, 323 S.C. 121, 125, 473 S.E.2d 793, 795 (1996) (citations omitted and emphasis added). Therefore, the expert testimony as to proximate cause must provide a significant causal link between the alleged negligence and the injuries suffered, rather than a tenuous and hypothetical connection. *Id.*

■■■■■ However, in determining whether particular evidence meets the "most probably" test, it is not necessary that the testifying expert actually use the words "most probably." *Baughman v. Am. Tel. & Tel.*, 306 S.C. 101, 111, 410 S.E.2d 537, 543 (1991); *see also Gamble v. Price*, 289 S.C. 538, 541, 347 S.E.2d 131, 132–33 (Ct.App.1986) (holding the exact words "most probably" need not be used by the expert). The *Baughman* court held:

It is not sufficient for the expert to testify merely that the ailment might or could have resulted from the alleged cause. He must go further and testify that taking into consideration all the data it is his professional opinion that the result in question most probably came from the cause alleged. In determining whether particular evidence meets this test it is not necessary that the expert actually use the words "most probably." It is sufficient that the testimony is such "as to judicially impress that the opinion ... represents his professional judgment as to the most likely one among the possible causes."

*Baughman,* 306 S.C. at 111, 410 S.E.2d at 543 (citations omitted).

## A. Alleged Negligence of Dr. Long and Dr. Thomas

Mrs. Martasin relied primarily on the testimony of Dr. Saleh to establish the failure of Dr. Long and Dr. Thomas to treat the TLS was a breach of the standard of care that resulted in the death of Mr. Martasin.

Dr. Saleh testified it was a deviation from the standard of care not to prophylax Mr. Martasin against TLS when administering Prednisone as treatment for leukemia. Dr. Saleh testified:

It is a written law of oncology that any tumor that is sensitive to chemotherapy, there is a propensity of killing the cell very rapidly, that you have to prophylax the patient against the effect of killing the tumor ... [t]hat kills the malignant cells but the product of cell death results in liver shutdown, kidney shutdown, heart failure.... If you treat the patient for that condition, with this amount of tumor burden, you have to prophylax the patient.

Dr. Saleh emphasized the need to take prophylactic measures against the build-up of toxins when you prescribe a patient Prednisone, and, importantly, testified this would be the standard of care for an oncologist as well as a doctor practicing "general internal medicine."[1] Dr. Saleh explained:

---

1. In granting the directed verdict, the circuit court noted that Dr. Saleh's expert testimony was deficient because he failed to differentiate between the appropriate standard of care applicable to an oncologist (such as Dr. Thomas) versus the standard applicable to a physician who

[T]umor lysis prophylaxis is instituted by my residents, first year residents, even by medical students. This is internal medicine therapy. It does not require an oncologist. The oncologist may treat the patient for the treatment of the malignancy but tumor lysis prophylaxis ... is general internal medicine. In fact, there are board questions that ask internists to say what would you do in a patient getting leukemic therapy for his high white count; you have a high white count, what would you do. And the answer is tumor lysis prophylax.

Based on his review of the pertinent medical records, Dr. Saleh concluded that the cause of Mr. Martasin's death was the TLS that occurred as a result of the Prednisone being administered without necessary prophylactic measures being instituted. Admittedly, Dr. Saleh did not use the magic words "most probably," but the entirety of the evidence persuades us that Mrs. Martasin presented sufficient evidence to withstand the directed verdict motion with respect to Dr. Long and Dr. Thomas.

Accordingly, viewing the evidence in the light most favorable to Mrs. Martasin as we must, we conclude that a reasonable jury could have found as fact that Mr. Martasin's death was most probably the result of the Prednisone treatment that Dr. Long and Dr. Thomas implemented without taking appropriate measures to treat the TLS. The order of the circuit court granting a directed verdict in favor of these two physicians is reversed, and the matter is remanded for a new trial. Additionally, our ruling reversing the directed verdict as to these two individual defendants extends to the corresponding corporate defendants plaintiff claimed were vicariously liable for Dr. Long's and Dr. Thomas's alleged negligence.

### B. Proof of Causal Link to the Alleged Negligence of Dr. Hart

As noted above, Dr. Frank Hart was the physician who examined Mr. Martasin when he returned to Hilton Head

---

does not specialize in cancer treatment (such as Dr. Long). This distinction, however, is not germane in the present case in light of Dr. Saleh's testimony that the need to prophylax against TLS is basic medical knowledge, known to physicians practicing general internal medicine as well as oncologists—even "first year residents" and "medical students."

Hospital on Saturday, December 9th, after the initial discharge by Dr. Long and Dr. Thomas two days earlier. Dr. Hart concluded it was not necessary to admit Mr. Martasin to the hospital at that time. Mrs. Martasin claims there is sufficient evidence upon which a reasonable jury could conclude the failure of Dr. Hart to admit her husband to the hospital that Saturday and implement prophylaxis for the TLS was a proximate cause of her husband's death. We disagree.

Plaintiff's expert, Dr. Saleh, was asked about Dr. Hart's examination of Mr. Martasin on Saturday, December 9th and whether Mr. Martasin's death could have been prevented had Dr. Hart admitted him to the hospital that day and begun immediate prophylactic measures to counteract the TLS. Though the transcript reveals some confusion in Dr. Saleh's initial attempt to respond to this line of questioning, defense counsel asked for and received clarification:

> DR. SALEH: ... If you have not prophylaxed and you get into the acute setting, the odds are less. But there's still one in three chance you can salvage the patient in that setting, yes.

Therefore, according to Dr. Saleh's expert opinion, there was only a "one in three chance" Mr. Martasin's fatal TLS could have been prevented had Dr. Hart admitted Mr. Martasin on Saturday, December 9th and initiated immediate prophylactic measures. This assessment fails to establish the causal link required under South Carolina law to recover for medical negligence.

We first note that our supreme court has expressly declined to adopt the "loss of chance" doctrine, which, in the context of medical malpractice, "permits a recovery when the delay in proper diagnosis or treatment of a medical condition results in the patient being deprived of a less than even chance of surviving or recovering." *Jones v. Owings*, 318 S.C. 72, 75, 456 S.E.2d 371, 373 (1995). In rejecting the doctrine, the supreme court stated, "We consider the better rule to be that in order to comport with the standard of proof of proximate cause, plaintiff in a malpractice case must prove that defendant's negligence, *in probability,* proximately caused the death." *Id.* at 76, 456 S.E.2d at 373 (emphasis in original).

More recently, in *Haselden v. Davis,* 341 S.C. 486, 534 S.E.2d 295 (Ct.App.2000), this court had the opportunity to determine whether evidence which demonstrates the negligence of a physician in failing to diagnose the decedent, who would have had a greater than fifty percent chance of survival except for the negligence of the doctor, satisfies the "most probably" standard. We held that, when an individual would have had a greater than fifty percent chance of survival if the physician had properly advised the decedent at an earlier time, evidence of the failure to do so satisfies the "most probably" requirement for causation. *Id.* at 495, 534 S.E.2d at 300.

In the instant case, Dr. Saleh's testimony demonstrates that Mr. Martasin would not have had a greater than fifty percent chance of survival if the TLS had been recognized and treated on December 9, 1995. Indeed, the testimony makes plain—in clear, quantitative terms—that Dr. Hart's decision not to admit Mr. Martasin to the hospital deprived him of roughly a thirty percent chance of survival. The survival chances articulated in this expert assessment therefore fall well short of satisfying the "most probably" causation standard. Moreover, a thorough review of the record reveals no other evidence that would tend to establish that Dr. Hart's actions contributed in any material way to Mr. Martasin's death.

Finding no evidence upon which a reasonable jury could conclude the alleged negligent acts or omissions of Dr. Hart proximately caused Mr. Martasin's death, we conclude the circuit court's grant of a directed verdict in favor of Dr. Hart was proper. Our ruling extends as well to any of the corporate defendants Mrs. Martasin claimed were vicariously liable for Dr. Hart's alleged negligence.

## II. Punitive Damages

Mrs. Martasin argues the circuit court erred in granting Respondents' motion for directed verdict on her claim for punitive damages. We agree.

In any civil action where punitive damages are claimed, the plaintiff has the burden of proving such damages by clear and convincing evidence. S.C.Code Ann. § 15–33–135 (2005). Punitive damages can only be awarded where the

plaintiff proves by clear and convincing evidence the defendant's misconduct was willful, wanton, or in reckless disregard of the plaintiff's rights. *Taylor v. Medenica*, 324 S.C. 200, 221, 479 S.E.2d 35, 46 (1996); *Lister v. NationsBank of Delaware*, 329 S.C. 133, 149, 494 S.E.2d 449, 458 (Ct.App. 1997). "The issue of punitive damages must be submitted to the jury if more than one reasonable inference can be drawn from the evidence as to whether the defendant's behavior was reckless, willful, or wanton." *Welch v. Epstein*, 342 S.C. 279, 301, 536 S.E.2d 408, 419 (Ct.App.2000).

Without repeating the relevant testimony already discussed above, and viewing the evidence in a light most favorable to Mrs. Martasin, there is some evidence that the decision by Dr. Long and Dr. Thomas to prescribe Prednisone without instituting prophylactic measures to prevent the TLS was a breach of the most basic standard of care such as to give rise to a reasonable inference that this decision rose to the level of recklessness. Therefore, the issue as to whether these alleged negligent acts were reckless was properly a question for the jury.

### CONCLUSION

We find there was sufficient evidence upon which a reasonable jury could conclude that Dr. Long's and Dr. Thomas's failure to treat the TLS was a breach of the applicable standard of care that proximately caused Mr. Martasin's death. We therefore reverse the directed verdict granted in favor of these two defendants and the corresponding corporate entities. With respect to Dr. Hart, we find there was not sufficient evidence proving his alleged negligence proximately caused Mr. Martasin's death. The directed verdict granted to him and the corresponding corporate defendants is therefore affirmed. Finally, we reverse the circuit court's grant of directed verdict on Mrs. Martasin's claim for punitive damages.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

HUFF and BEATTY, JJ., concur.