THIS OPINION HAS NO PRECEDTIAL VALUE AND SHOULD NOT BE CITED OR RELIED ON AS 

PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 Peggy Salters, Respondent,
 v.
 Palmetto Health Alliance Inc; d/b/a Palmetto Baptist Medical Centers; Robert Schnackenberg, M.D., individually; Eric Lewkowiez, M.D., individually; Columbia Psychiatric Associates, PA, P. Kenneth Huggins, M.D., individually, Defendants,
 of whom Eric Lewkowiez, M.D. 
 Appellant.
 
 
 

Appeal From Richland County
 L. Casey Manning, Circuit Court Judge
Unpublished Opinion No. 2007-UP-187
Submitted April 3, 2007  Filed April 24, 2007    

AFFIRMED

 
 
 
 William H. Davidson, II, Andrew F. Lindemann,
 Lawrence S. Kerr, all of Columbia, for Appellant.
 John W. Carrigg, Jr., Mark Weston Hardee, Peter Demos Protopapas, all of Columbia, for Respondents.
 
 
 

PER CURIAM:  In this medical malpractice action, Dr. Eric Lewkowiez appeals the trial courts refusal to direct a verdict or a judgment notwithstanding the verdict in his favor.  Dr. Lewkowiez contends the evidence presented at trial was insufficient to prove to a reasonable degree of medical certainty that his alleged breach of the standard of care proximately caused Peggy Salters injuries.  We affirm.[1]
FACTS
This appeal concerns a series of electroconvulsive therapy (ECT) treatments Salters received as a result of severe depression.  Salters first received ECT treatments in the late 1980s when medication did not seem to alleviate her depression.  Her physician at the time, Dr. John Emerick, recommended ECT treatments.  Dr. Emerick noted as the ECT treatments progressed Salters became less depressed, more organized, and less suicidal.       She again underwent treatments in 1990, and the ECT appeared to lessen her symptoms.  From 1992-99 Salters had no psychiatric history.
 
In 1998, Salters received a Masters of Science in Nursing and, in 1999, became certified as a nurse practioner.  During this time, Salters experienced the deaths of several close family members, most notably, the death of her husband in October 1999.  These deaths had a severe effect on Salters mental health and she again sought psychiatric care.   
On August 8, 2000, she met with Dr. Lewkowiez.  At their first meeting, he found Salters was tearful, had low energy, and had trouble sleeping.  Salters informed him she had a poor appetite, and in fact, had lost forty pounds since her husbands death.  Dr. Lewkowiez diagnosed Salters with major depression, recurrent and severe.  He also believed she suffered from passive suicidal ideation, which is a condition describing people who have suicidal thoughts but no plans to implement suicide.  Dr. Lewkowiez recommended numerous anti-depressant drugs as part of Salters treatment.    
Between September 13 and Salters next appointment with Dr. Lewkowiez on October 2, Salters called Dr. Lewkowiez from Salt Lake City, Utah and informed him it was her intention to commit suicide, however, after they spoke, Salters changed her mind.  The antidepressants appeared to have no effect on Salters and she was unable to function at work.  Therefore, when she next saw Dr. Lewkowiez, he broached the subject of ECT because the procedure had been effective in the past.  This was the first time Dr. Lewkowiez had ever recommended a patient for ECT and he referred Salters to Dr. Robert Schnackenberg.   Dr. Lewkowiez spoke to Dr. Schnackenberg and they examined her past medical records extensively, including her history of ECT.  Both doctors felt she was an appropriate candidate for the procedure.
Dr. Schnackenberg administered ECT on October 9, 11, 13, 16, 17, 18, 19, 20, 23, 24, 25, 26, and 27, 2000, and on November 3, 10, and 17, 2000.   The first set of treatments were spaced conventionally, and given every other day.  The following two weeks Dr. Schnackenberg administered what are referred to in the medical community as intensive or regressive ECTswhich are ECTs administered daily.  The ECT treatments Dr. Schnackenberg administered in November were considered maintenance ECT which continued the effects of the previously administered ECTs.
On October 10, 2000, on Salters outpatient ECT record, a notation made by one of the nurses provided: faxed to Dr. Lewkowiez 10/11/00 at 1:10 p.m.  Ten days later on October 20, a notation on the outpatient record provided: Office Rosa notified at 3:35 she states Dr. Lewkowiez called and he will check on patient today.  Although both of these medical records seem to suggest Dr. Lewkowiez had contact with Salters, he denied having any contact with her until November, after the intensive ECTs had already been administered.
On November 2, Dr. Lewkowiez met with Salters.  His notes from their meeting show that Salters missed an ECT the previous Monday and that she had memory difficulties.  However, Dr. Lewkoweiz did not recommend she stop the ECT and, in fact, Dr. Schnackenbergs records suggest he encouraged her to continue with the ECT.  Moreover, he did not inform Dr. Schnackenberg about Salters memory complaints.   On November 13, they met again and Dr. Lewkowiez noted Salters had continued difficulty with her memory and that she was unable to function at work or home.  Additionally, Salters was losing weight and unable to sleep.  On November 30, Dr. Lewkowiez observed Salters continued to be confused and disoriented.  At this point, Salters decided to stop the ECT because she was completely unable to function.   
After Salters stopped the ECT treatments, her memory problems did not subside.   She continued to see Dr. Lewkowiez and he recommended she go on disability.  He did not believe she had the ability to pay attention, listen and do what was necessary to treat patients.  Eventually, Dr. Lewkowiez recommended Salters see psychologist Dr. Mary Elizabeth Shea for memory loss secondary to ECT.  In Dr. Sheas opinion, Salters suffered memory loss as a result of the ECT treatments.
Salters filed suit against Dr. Lewkowiez, Dr. Schnackenberg, Dr. Huggins, as well as Columbia Psychiatric Associates, P.A.,[2] and Palmetto Baptist Hospital,[3] alleging the physicians were liable for memory loss she sustained following a course of negligent treatment for severe depression that included ECT.  At trial, Salters offered expert testimony to establish the negligence of these physicians proximately caused her memory loss.  At the close of the evidence, the physicians moved for a directed verdict.  Dr. Lewkowiez argued he did not breach the standard of care, moreover, any alleged breach did not proximately cause Salters injuries.  The trial court denied the motion.  After trial, the jury found in favor of Dr. Huggins and Dr. Schnackenberg and found in favor of Salters against Dr. Lewkowiez for medical negligence in the amount of $625,177.00 in actual damages.  After the verdict, Dr. Lewkowiez filed a motion for judgment notwithstanding the verdict and a new trial, which the trial court denied.  This appeal followed. 
 
STANDARD OF REVIEW
When ruling on a motion for a directed verdict or judgment notwithstanding the verdict, the trial court must view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions. Sabb v. S.C. State University  350 S.C. 416, 427, 567 S.E.2d 231, 236 (2002).  If the evidence as a whole is susceptible to more than one reasonable inference, a jury issue is created and the motion should be denied.  Martasin v. Hilton Head Health Sys., 364 S.C. 430, 437, 613 S.E.2d 795, 799 (Ct. App. 2005) (citation omitted). 
 
LAW/ANALYSIS
Lewkowiez argues the trial court erred in not granting a directed verdict or a judgment notwithstanding the verdict because Salters failed to present sufficient evidence to establish the requisite causal connection between Lewkoweizs alleged breach of the standard of care and Salters injury.  Specifically, Lewkowiez argues his alleged breach of the standard of care could not be the proximate cause of Salters injuries because her expert testified the intensive ECT caused Salters disabilities and Dr. Lewkoweiz did not meet with her until after that part of the treatment was over.  We disagree.
In South Carolina, a physician commits malpractice by failing to exercise the requisite degree of skill and learning generally possessed and exercised by other members of the medical profession acting in a similar situation or circumstance.  David v. McLeod Regional Med. Ctr., 367 S.C. 242, 247, 626 S.E.2d 1, 3 (2006).  A plaintiff in a medical malpractice action must first establish by expert testimony, unless the subject matter is of such common knowledge that no special testimony is needed, evidence of the generally recognized practice and procedures that would be exercised by competent practitioners in a defendant doctors field of medicine under the same or similar circumstances. Gooding v. St. Francis Xavier Hosp., 326 S.C. 248, 254, 487 S.E.2d 596, 599 (1997) (citation omitted).  Secondly, the plaintiff must show the defendant physicians departure from the generally accepted medical standards and procedures.  Id. 
 
Further, it is incumbent on the plaintiff to establish proximate cause as well as the negligence of the physician.  Ellis v. Oliver, 323 S.C. 121, 125, 473 S.E.2d 793, 796 (1996) (citation omitted).  As the South Carolina Supreme Court noted in Ellis, negligence may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided.  323 S.C. at 125, 473 S.E.2d at 795.  A party relying solely on expert testimony to establish proximate cause between the physicians negligence and the plaintiffs injury, must introduce evidence the physicians negligence most probably resulted in the injuries alleged.  Gooding, 326 S.C. at 254, 487 S.E.2d at 599.  However, in determining whether particular evidence meets the most probably test, it is not necessary the testifying expert actually use the words most probably.  Martasin v. Hilton Head Health Sys., 364 S.C. 430, 438, 613 S.E.2d 795, 800 (Ct. App. 2005) (citation omitted).  As long as the experts testimony is such as to judicially impress that the opinion . . . represents his professional judgment as to the most likely one among the possible causes the testimony will be deemed sufficient to establish proximate cause.  Baughman v. Am. Tel. & Tel., 306 S.C. 101, 111, 410 S.E.2d 537, 543 (1991) (citation omitted). 
 
In this case, Salters presented the testimony of Dr. Peter Breggin, a psychiatrist and an expert in ECT to establish the standard of care for attending psychiatrists who continue to care for their patients after referring the patient to a specialist.  Dr. Breggin testified as to the duties of attending and treating physicians for when patients develop severe cognitive side effects.   Dr. Breggin testified Dr. Lewkowiez and Dr. Schnackenberg had a duty to review and adjust the treatment technique being used, (e.g., switching to unilateral ECT, lowering the electric dose administered, and/or increasing the time interval between the treatments).  

Dr. Breggin opined in this particular case that the standard of care required Dr. Lewkowiez to communicate to Dr. Schnackenberg the side effects the ECT treatments were having on Salters.  According to Dr. Breggin, Dr. Lewkoweizs medical records indicated Salters was experiencing memory problems and that her personality had drastically changed.  However, Dr. Lewkowiez did not inform Dr. Schnackenberg of these changes; rather, Dr. Schnackenbergs medical records show Dr. Lewkowiez encouraged Salters to continue with the treatments.  Based on his review of the medical records, Dr. Breggin concluded Dr. Lewkowiez deviated from the standard of care by not stopping the ECT treatments after he saw Salters change in personality.   Further, Dr. Breggin stated he believed Salters disability was caused by the intensive ECT treatments.  He elucidated:

 Its cumulative.  We see her having some memory loss and cognitive problems from the first ECTs; and then from the later ECTs. But she keeps recovering and going back to work and functioning on a high level; and finally shes tipped over by the accumulation and the intensive ECT.
 

Even if the only evidence of causation was Dr. Breggins testimony, when viewed in a light most favorable to Salters, a jury could have inferred the cumulative effect of the intensive and maintenance ECT treatments were the proximate cause of her injuries, and had Dr. Lewkowiez informed Dr. Schnackenburg of the changes Salters was experiencing, the treatments would have stopped. 
 
Dr. Lewkowiez maintains that because he did not see Salters until after Dr. Schnackenberg had administered the intensive ECTs, when the damage to Salters had already occurred, his alleged breach of the standard of care described by Dr. Breggin could not be the proximate cause of the injuries.  First, as noted above, there is evidence in the record from which the jury could have inferred the cumulative effect of the ECT treatments caused Salters injuries.  Secondly, assuming only the intensive ECT did cause Salters injuries a reasonable jury could have found the medical records dated October 10 and 20 show that Dr. Lewkoweiz did check to see how Salters was tolerating the ECT.
 
Dr. Lewkoweiz points to the South Carolina Supreme Courts recent decision in David v. McLeod Regional Medical Center, to support his proposition that Salters failed to establish how the facts of the case would have been different had Dr. Lewkoweiz informed Dr. Schnackenberg that Salters personality had drastically changed and she was suffering from severe memory loss. In David, unlike the situation presented here, the supreme court found the appellant provided no evidence how his injuries would have been different had the physician communicated his thoughts for treatment to the pathologist:  
 

 Stated differently, Dr. Frists affidavit fails to explain how Dr. Brussetts post-diagnosis treatment would have affected the pathologists initial diagnosis of the tumor.  As a result, there is no evidence that Dr. Brussetts failure to communicate Appellants possible treatment options with the pathologist was the proximate cause of Appellants injuries.

367 S.C. at 249, 626 S.E.2d at 4.  We also note in David the appellant failed to provide the standard of care the physicians allegedly breached.  Id.  In this case, not only did Dr. Breggin testify regarding the standard of care, his testimony provided the jury with evidence on the effect Dr. Lewkowiez breach had upon Salters.  Dr. Breggin testified that Dr. Lewkowiez did nothing to stop the ECT . . . theres the report of the memory problems and the change is fairly obvious and he did nothing to interfere at that point.   Further, Dr. Breggin testified Dr. Lewkowiez should have called Dr. Schnackenberg and informed him of Salters reaction to the procedure.  We find there is ample evidence that as a result of Dr. Lewkowiezs failure to inform Dr. Schnackenberg of Satlers reaction to the procedure, she was exposed to additional ECT treatments.  Viewing the totality of the evidence, we conclude a jury could have found Salers injuries were most probably the result of Dr. Lewkowiezs breach of the standard of care.  Accordingly, the trial court did not err in failing to grant a directed verdict or a judgment notwithstanding the verdict.
 
Next, Dr. Lewkowiez argues the trial court erred in finding he had a duty to monitor Salters progress because the issue was not presented at trial nor mentioned in the complaint.  Although the words duty to monitor may not have been uttered during the course of the trial, when reviewing Dr. Breggins testimony it is clear the duty to communicate is essentially the duty to monitor.  Further, because of the disposition of the first issue, there is no need to address this argument.
Dr. Lewkowiez also contends the trial court erred by finding him liable under a vicarious liability theory.  The trial court did not charge the jury regarding vicarious liability nor is there any evidence in the record that such a theory was presented at trial.  Accordingly, this argument has no merit. 
 
CONCLUSION
We find sufficient evidence upon which a jury could conclude Dr. Lewkowiezs breach of the standard of care proximately caused Salters injuries.  Accordingly, the order of the trial court is
 
AFFIRMED.
ANDERSON, KITTREDGE, and SHORT, JJ., concur.

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.
[2] Salters alleges Lewkowiez and Schnackenberg are members of Columbia Psychiatric Associates but the record is unclear on this point.
[3] During the course of the trial, Salters settled with Palmetto Baptist Hospital.