771 S.E.2d 639

Sean D. FAY, as Personal Representative for the Estate
of Kelly L. Fay, Deceased, Respondent/Appellant,

v.

GRAND STRAND REGIONAL MEDICAL CENTER, LLC, d/b/a
South Strand Ambulatory Care Center and Stephen W. Law,
D.O., Dr. Richard Young, M.D., and Grand Strand Urology,
LLP, Defendants,

Of whom Stephen W. Law, D.O. is also an Appellant,

and

Of whom Dr. Richard Young, M.D., and Grand
Strand Urology, LLP, are Respondents.

Appellate Case No. 2010–167127.
No. 5306.

Court of Appeals of South Carolina.

Heard Feb. 11, 2015.
Decided April 1, 2015.

186

J. Boone Aiken III, of Aiken Bridges Elliott Tyler & Saleeby, P.A., of Florence, and Andrew F. Lindemann, of Davidson & Lindemann, P.A., of Columbia, for Appellant.

John S. Nichols, of Bluestein Nichols Thompson & Delgado, and Ruskin C. Foster, of Mike Kelly Law Group, LLC, both of Columbia, for Respondent/Appellant.

Marian Williams Scalise and Lydia Lewis Magee, both of Richardson Plowden & Robinson, P.A., of Myrtle Beach, and Carmen Vaughn Ganjehsani, of Richardson Plowden & Robinson, P.A., of Columbia, for Respondents.

KONDUROS, J.

In this cross-appeal from a medical malpractice action, Sean Fay (Sean) argues the trial court erred in granting Dr. Richard Young's motion for a directed verdict on public policy grounds. In the appeal against Sean, Dr. Stephen Law argues the trial court erred in (1). denying his motion for a judgment notwithstanding the verdict (JNOV), (2) excluding evidence of Sean's admitted extramarital affair, and (3) refusing to enroll the judgment against him using the jury's determination of six percent negligence on his part and instead using joint and several liability. We affirm.

**FACTS/PROCEDURAL HISTORY**

At approximately 8:00 a.m., Saturday, January 26, 2002, Kelly Fay (Kelly), accompanied by her husband Sean, presented to Grand Strand Regional Medical Center's (the Hospital[1]) emergency room, complaining of abdominal and right flank pain. Kelly believed it was caused by a kidney stone because she had previously experienced the same pain, which had been a kidney stone. Dr. Stephen Law, the emergency room physician, examined her approximately four minutes after she arrived. She complained of mild nausea but had not vomited, and she denied fevers and chills. Kelly initially described her pain level as being a seven or eight out of ten, and it decreased to a five or six out of ten after receiving pain medication.

Her vital signs and temperature were normal when they were first taken.[2] A physical examination revealed moderate to severe flank tenderness on the right side, but the abdomen was soft, non-tender, and non-distended. Dr. Law suspected a kidney stone and ordered a kidney, ureter, and bladder (KUB)

---

1. The Hospital settled with Sean while this matter was pending, and that portion of the appeal has been remitted.

2. The medical records show multiple vital sign readings, but her temperature was only taken when she arrived around 8:00 a.m.

x-ray, which revealed a moderate-sized kidney stone in the right kidney. A CT scan confirmed this and indicated a half centimeter in diameter kidney stone in the ureter of the right kidney. To rule out infection, Dr. Law also ordered a urinalysis, which showed no blood or bacteria in the urine.

After deciding Kelly was stable to discharge, Dr. Law spoke with Dr. Young, the on-call urologist, on the telephone to make sure he was available to examine Kelly on Monday. However, Dr. Law testified he was not seeking advice or permission from Dr. Young to admit Kelly. Dr. Law spoke with Kelly and Sean, allegedly informing them to immediately return to the emergency department if she experienced uncontrollable pain, nausea, vomiting, fever, or chills.[3] Dr. Law additionally instructed them to call Dr. Young on Monday at 8:30 a.m. to schedule an appointment for that day. The nursing staff then provided written discharge instructions, which Kelly signed, informing the Fays to call or return to the emergency room if she developed a fever, intense pain, or vomiting. Kelly and Sean left the emergency room at approximately 12:00 p.m., and Kelly allegedly looked flushed, a little warm, and red. Notably, her temperature was not taken before she left.

About an hour later, after picking up a prescription, Kelly's temperature was, as testified to by Sean, either 101.3 or 101.6 degrees Fahrenheit. Over the weekend, she continued to experience a fever of 101.3 or 101.6 degrees Fahrenheit, severe chills, nausea, and vomiting. Kelly did not return to the emergency room because she would alternate between feeling better and worse throughout the weekend and believed she could wait until her appointment on Monday with Dr. Young.

After calling Dr. Young to schedule an appointment on Monday, Sean went to work that morning, planning to return to take Kelly to see Dr. Young around 2:00 p.m. After failing to reach her by telephone several times, Sean returned home around 1:30 p.m. to find Kelly unresponsive, gagging, and convulsive. EMS responded and found Kelly on the floor, hot to the touch, with shallow rapid breathing. Upon arrival at

---

3. Sean disputes this conversation occurred.

the hospital, Kelly had a fever of 105 degrees. Kelly died Monday evening at the emergency room from clinical sepsis.[4]

Subsequently, Sean brought this wrongful death and survival action for medical malpractice against Dr. Law, the Hospital, and Dr. Young and his practice, Grand Strand Urology. The trial began on May 17, 2010. On May 26, at the close of all of the evidence, the trial court granted Dr. Young's motion for a directed verdict on public policy grounds. The jury returned a $3 million verdict against the Hospital and Dr. Law two days later.[5] On June 7, 2010, Dr. Law and the Hospital filed post-trial motions for JNOV, new trial absolute, and new trial *nisi* remittitur. The trial court filed its orders denying all post-trial matters on June 24, 2010. Dr. Law filed a motion to reconsider, which the trial court ultimately denied on August 26, 2011. This appeal followed.

## LAW/ANALYSIS

As a threshold matter, Dr. Young argues Sean failed to timely serve his notice of appeal, and Sean argues Dr. Law failed to timely serve his notice of appeal. We find both parties' appeals are properly before us and address the merits.

### I. Grant of Dr. Young's Directed Verdict Motion

█ Sean contends the trial court erred in granting Dr. Young's motion for a directed verdict. We disagree.

█ In ruling on motions for directed verdict, "the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions." *McMillan v. Oconee Mem'l Hosp., Inc.*, 367 S.C. 559, 564, 626 S.E.2d 884, 886 (2006). "When considering directed verdict motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence." *Parrish v. Allison*, 376 S.C. 308, 319, 656 S.E.2d 382, 388 (Ct.App.2007). "The issue must be submitted to the

---

4. Clinical sepsis or septic shock is an "overwhelming blood-borne infection within the body."

5. The jury concluded Sean was four percent negligent and the trial court calculated the damages to be enrolled for the plaintiff to be $2.88 million.

jury whenever there is material evidence tending to establish the issue in the mind of a reasonable juror." *Id.* "Yet, this rule does not authorize submission of speculative, theoretical, and hypothetical views to the jury." *Id.* at 319–20, 656 S.E.2d at 388.

The court must determine whether any evidence existed on each element of the cause of action. *First State Sav. & Loan v. Phelps,* 299 S.C. 441, 446, 385 S.E.2d 821, 824 (1989). "If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and the motion should be denied." *Martasin v. Hilton Head Health Sys.,* 364 S.C. 430, 437, 613 S.E.2d 795, 799 (Ct.App.2005). However, "[a] directed verdict should be granted where the evidence raises no issue for the jury as to the defendant's liability." *Guffey v. Columbia/Colleton Reg'l Hosp., Inc.,* 364 S.C. 158, 163, 612 S.E.2d 695, 697 (2005).

The appellate court will reverse the circuit court's ruling on a directed verdict motion only when no evidence supports the ruling or the ruling is controlled by an error of law. *Law v. S.C. Dep't of Corr.,* 368 S.C. 424, 434–35, 629 S.E.2d 642, 648 (2006). "The appellate court must determine whether a verdict for a party opposing the motion would be reasonably possible under the facts as liberally construed in his [or her] favor." *Erickson v. Jones St. Publishers, L.L.C.,* 368 S.C. 444, 463, 629 S.E.2d 653, 663 (2006).

A plaintiff in a medical malpractice case must present (1) evidence of the generally recognized practices and procedures that would be exercised by competent practitioners in a defendant doctor's field of medicine under the same or similar circumstances, (2) evidence that the defendant doctor departed from the recognized and generally accepted standards, practices, and procedures in the manner alleged by the plaintiff, and (3) evidence that the defendant's departure from the generally accepted standards and practices was the proximate cause of the plaintiff's injuries and damages. *Hoard ex rel. Hoard v. Roper Hosp., Inc.,* 387 S.C. 539, 546, 694 S.E.2d 1, 4–5 (2010).

"The establishment of a doctor/patient relationship is a prerequisite to a claim of medical malpractice." *Roberts*

*v. Hunter*, 310 S.C. 364, 366, 426 S.E.2d 797, 799 (1993). "The relation is a consensual one wherein the patient knowingly seeks the assistance of a physician and the physician knowingly accepts him as a patient." *Id.* (quotation marks omitted). "Whether the law recognizes a particular duty is an issue of law to be determined by the court." *Ellis ex rel. Ellis v. Niles*, 324 S.C. 223, 227, 479 S.E.2d 47, 49 (1996). If a duty does not exist, the defendant in a negligence action is entitled to a directed verdict. *Id.* Although the court must determine whether the law recognizes a duty, "[t]he existence of a physician-patient relationship is a question of fact for the jury." *Fuller v. Blanchard*, 358 S.C. 536, 546, 595 S.E.2d 831, 836 (Ct.App.2004) (quotation marks omitted).

In *Roberts*, our supreme court first considered whether a doctor-patient relationship may exist when the patient has not been examined or treated by the doctor. 310 S.C. at 366–68, 426 S.E.2d at 799–800. After summarizing several cases from other jurisdictions,[6] the court concluded granting the directed verdict in favor of the doctor was proper when the doctor did not examine the patient or review his file. *Id.* at 366–67, 426 S.E.2d at 799. One fact distinguishable from the present case, however, is the patient in *Roberts* voluntarily left the hospital before the doctor had the opportunity to examine him. *Id.* at 365, 426 S.E.2d at 798.

In *Ellis*, the supreme court affirmed the trial court's grant of a directed verdict for lack of a doctor-patient relationship and, therefore, a lack of duty. 324 S.C. at 228, 479 S.E.2d at 49. In *Ellis*, neither the trauma team leader nor the second in

---

**6.** *See Oliver v. Brock*, 342 So.2d 1, 4–5 (Ala.1976) (finding no relationship when consulting physician gave treating physician his opinion of the patient's condition, but no evidence was presented that consulting physician consented to treat the patient or to act in a consulting capacity); *Hill ex rel. Burston v. Kokosky*, 186 Mich.App. 300, 463 N.W.2d 265, 266–68 (1990) (holding a doctor-patient relationship did not arise when the patient never sought medical advice or treatment from the doctor and the doctor did not have any contact with the patient, see any records, or even know the patient's name after the treating physician consulted with the doctor informally); *Mozingo ex rel. Thomas v. Pitt Cnty. Mem'l Hosp.*, 101 N.C.App. 578, 400 S.E.2d 747, 751 (1991) (holding no relationship between supervising physician and patient when supervising physician arrived at the hospital after the child was born with disabilities and after any alleged negligence occurred).

command undertook treatment of the patient or supervised his care, but the team leader did speak to the treating physician once on the telephone. *Id.* at 226, 479 S.E.2d at 48.

"[T]his court[ ] may affirm a trial [court's] decision on any ground appearing in the record and, hence, may affirm the trial [court's] correct result even though [it] may have erred on some other ground." *Potomac Leasing Co. v. Otts Mkt., Inc.,* 292 S.C. 603, 606, 358 S.E.2d 154, 156 (Ct.App.1987). The reasoning adopted by the trial court is not binding upon this court if the record discloses a correct result. *Id.; see also* Rule 220(c), SCACR.

We find the trial court did not err in granting Dr. Young's directed verdict motion because Sean failed to establish the existence of a doctor-patient relationship between Kelly and Dr. Young. Even viewing the evidence in the light most favorable to Sean, we find it shows only that Dr. Young briefly spoke with Dr. Law, who informed him Kelly was afebrile [7] with stable vital signs, was suffering from a half-centimeter moderately-to-severely obstructing stone located in the utero-pelvic junction, and had a normal urinalysis, and he was preparing to discharge her. No evidence in the record established a doctor-patient relationship. Dr. Young never communicated with Kelly, never attempted to treat Kelly, and did not look at her records. Further, the Hospital's provision of her medical records to Dr. Young's office in anticipation of the Monday appointment does not create a doctor-patient relationship.

In addition, by the time Dr. Law spoke with Dr. Young, Dr. Law testified he had already obtained a history, lab work, vital signs, and radiology studies and had decided Kelly was stable for discharge. Moreover, Dr. Law specifically testified he was not calling Dr. Young to get advice about Kelly or requesting him to evaluate her. Because "[t]he establishment of a doctor/patient relationship is a prerequisite to a claim of medical malpractice," and Sean failed to establish the existence of a doctor-patient relationship, we affirm the directed verdict. *Roberts,* 310 S.C. at 366, 426 S.E.2d at 799.

---

7. Merriam–Webster defines "afebrile" as "not marked by or having a fever." Merriam–Webster Dictionary, *available at* http://www.merriam-webster.com/dictionary/afebrile.

## II. Denial of Dr. Law's JNOV Motion

■ Dr. Law argues the trial court erred in denying his JNOV motion because the only reasonable inferences to be drawn from the evidence are that (1) Dr. Law complied with all accepted standards of care for an emergency physician and did not cause harm to either Sean or Kelly and (2) the Fays' failure to return to the emergency room when Kelly's condition deteriorated proximately caused her death and their degree of fault at least exceeded fifty percent. We disagree.

In ruling on motions for directed verdict, "the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions." *McMillan*, 367 S.C. at 564, 626 S.E.2d at 886. "When considering directed verdict motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence." *Parrish*, 376 S.C. at 319, 656 S.E.2d at 388. "The issue must be submitted to the jury whenever there is material evidence tending to establish the issue in the mind of a reasonable juror." *Id.* "Yet, this rule does not authorize submission of speculative, theoretical, and hypothetical views to the jury." *Id.* at 319–20, 656 S.E.2d at 388.

The court must determine whether any evidence existed on each element of the cause of action. *Phelps*, 299 S.C. at 446, 385 S.E.2d at 824. "If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and the motion should be denied." *Martasin*, 364 S.C. at 437, 613 S.E.2d at 799. However, "[a] directed verdict should be granted where the evidence raises no issue for the jury as to the defendant's liability." *Guffey*, 364 S.C. at 163, 612 S.E.2d at 697.

The appellate court will reverse the circuit court's ruling on a directed verdict motion only when no evidence supports the ruling or the ruling is controlled by an error of law. *Law*, 368 S.C. at 434–35, 629 S.E.2d at 648. The appellate court must determine whether a verdict for a party opposing the motion would be reasonably possible under the facts as liberally construed in his or her favor. *Erickson*, 368 S.C. at 463, 629 S.E.2d at 663.

A plaintiff in a medical malpractice action must present (1) evidence of the generally recognized practices and procedures that would be exercised by competent practitioners in a defendant doctor's field of medicine under the same or similar circumstances, (2) evidence that the defendant doctor departed from the recognized and generally accepted standards, practices, and procedures in the manner alleged by the plaintiff, and (3) evidence that the defendant's departure from the generally accepted standards and practices was the proximate cause of the plaintiff's injuries and damages. *Hoard,* 387 S.C. at 546, 694 S.E.2d at 4–5.

Further, "unless the subject is a matter of common knowledge, the plaintiff must use expert testimony to establish both the standard of care and the defendant's failure to conform to that standard." *Gooding v. St. Francis Xavier Hosp.,* 326 S.C. 248, 254, 487 S.E.2d 596, 599 (1997). If expert testimony is the only evidence of proximate cause, the testimony must provide a "significant causal link . . . rather than a tenuous and hypothetical connection." *Hoard,* 387 S.C. at 546–47, 694 S.E.2d at 5. "When one relies solely upon the opinion of medical experts to establish a causal connection between the alleged negligence and the injury, the experts must, with reasonable certainty, state that in their professional opinion, the injuries complained of most probably resulted from the defendant's negligence." *Id.* at 546, 694 S.E.2d at 5 (quotation marks omitted).

However, a testifying expert is not required to use the words "most probably" for the evidence to meet the test. *Martasin,* 364 S.C. at 438, 613 S.E.2d at 800; *see also Baughman v. Am. Tel. & Tel. Co.,* 306 S.C. 101, 111, 410 S.E.2d 537, 543 (1991) ("It is sufficient that the testimony is such as to judicially impress that the opinion . . . represents his professional judgment as to the most likely one among the possible causes . . . ." (alterations in original) (internal quotation marks omitted)).

We find the trial court did not err in denying Dr. Law's motions for JNOV for both reasons because, in viewing the evidence in the light most favorable to Sean, the evidence was sufficient for a jury to find Dr. Law negligent in Kelly's death.

Dr. Law had a doctor-patient relationship with Kelly—he examined her, ordered several tests and x-rays, diagnosed her, and made the decision to discharge her. The primary questions are whether (1) no evidence was presented from which a reasonable jury could find a breach of the standard of care that proximately caused her death and (2) the only reasonable inference was the Fays' failure to return to the emergency room when Kelly's condition deteriorated proximately caused her death and their degree of fault at least exceeded fifty percent.

First, several expert medical witnesses, including Dr. Law, testified the combination of a fever and a kidney stone presents a urological emergency and an emergency room physician breaches the standard of care by failing to rule out infection, one symptom of which is the presence of a fever. Additionally, Dr. Law even admitted a second temperature should have been taken, he did not order one, and he would not have released her if she had a fever. Dr. Law suspected a kidney stone as early as 8:52 a.m., but Kelly's medical records do not contain a temperature reading after 8:06 a.m. Furthermore, the CT scan conducted at 10:20 a.m. confirmed Kelly suffered from a moderately-to-severely obstructing kidney stone, yet again a temperature was not taken and Dr. Law did not order one taken. In addition, when Dr. Law spoke with Dr. Young and informed him he planned to discharge Kelly, he stated she was afebrile, but he did not have a current temperature.

Notwithstanding Kelly's lack of other symptoms that might demonstrate a fever, Sean testified he did not see anyone take Kelly's temperature the entire time, though the record does reflect a normal temperature at 8:06 a.m., when they arrived. In addition, the jury could have inferred Kelly had a fever in the emergency room when Sean testified to her having a temperature of 101.3 degrees Fahrenheit approximately an hour after leaving. Although the experts could not opine to a reasonable degree of medical certainty that Kelly had an infection when she left, Dr. Mike Siroky did testify she more likely than not had a fever when she left the Hospital. From this, a jury could have found Dr. Law's failure to determine whether she had a fever before she left at least partially caused her death.

In addition, the parties disputed whether Dr. Law informed the Fays of the urgency of a fever, chills, and a kidney stone and to return to the emergency room if those symptoms arose. Although the discharge instructions state to return to the emergency room if such symptoms arise, a jury reasonably could have found they were ambiguous because the instructions also stated to call the emergency room.

Concerning Dr. Law's argument that the only reasonable inference was the Fays' failure to return to the emergency room when Kelly's condition deteriorated proximately caused her death, we conclude a jury reasonably could have found the evidence suggested Dr. Law and the other medical professionals failed to sufficiently inform the Fays of the dangerousness of a fever and a kidney stone. For example, Dr. Law testified he instructed the Fays to return if Kelly developed a fever or nausea; however, he admitted he never told them it was an emergency. It is true the Fays failed to return to the emergency room even though Kelly awoke screaming, shivering, and having chills, had a constant fever of over 101 degrees Fahrenheit the entire weekend after leaving the hospital, and was nauseated and unable to eat the majority of the weekend. However, a jury reasonably could have found the Fays were less negligent given the ambiguity the discharge instructions created by informing the Fays to call the Hospital or to return; the factual dispute concerning Dr. Law's alleged verbal instructions; the fact the side effects of the prescribed medicine included nausea, vomiting, and fever; Dr. Law's admission he never alerted them to the fact a kidney stone and a fever could be fatal; and Dr. Law's failure to verify Kelly did not have a fever before discharging her considering the significance fever has related to a kidney stone.

Accordingly, we find the trial court did not err in denying Dr. Law's motion for JNOV because, when viewing the evidence in the light most favorable to Sean, evidence existed from which a jury reasonably could have found Dr. Law was negligent and the Fays were less than fifty-one percent negligent. We therefore affirm.

### III.   Exclusion of Extra-marital Affair

 Next, Dr. Law argues the trial court erred in excluding evidence of Sean's extra-marital affair. We disagree.

The admission of evidence is within the trial court's discretion. *Watson ex rel. Watson v. Chapman*, 343 S.C. 471, 478, 540 S.E.2d 484, 487 (Ct.App.2000). "The court's ruling to admit or exclude evidence will only be reversed if it constitutes an abuse of discretion amounting to an error of law." *R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.*, 343 S.C. 424, 439, 540 S.E.2d 113, 121 (Ct.App.2000).

Damages recoverable for wrongful death are those suffered by the statutory beneficiaries resulting from the death of the decedent, "including pecuniary loss, mental shock and suffering, wounded feelings, grief, sorrow, and loss of society and companionship." *Ballard v. Ballard*, 314 S.C. 40, 41–42, 443 S.E.2d 802, 802 (1994); *see also* S.C.Code Ann. § 15–51–20 (2005). Dr. Law contends the trial court erred in excluding the affair because it is relevant and probative in assessing the damages Sean sustained for the loss of society and companionship [8] resulting from Kelly's death.

Evidence is admissible only if it is relevant. Rule 402, SCRE. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. Relevant evidence nonetheless "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Rule 403, SCRE.

South Carolina appellate courts have not previously addressed the admissibility of evidence of an extra-marital affair by either the decedent or the beneficiary in wrongful death or survival actions. Although not quite analogous, our supreme court has considered the admissibility of the surviving spouse's remarriage in both contexts. *See Smith v. Wells*, 258 S.C. 316, 320–21, 188 S.E.2d 470, 471–72 (1972) (holding evidence of remarriage is improper in wrongful death action because it would require a speculative comparison of the merits of the first and the second spouse and the circumstances that led to the remarriage); *Moultrie v. Med. Univ. of S.C.*, 280 S.C. 159,

---

8. Consortium and society or companionship are often used interchangeably. *See Panhorst v. Panhorst*, 301 S.C. 100, 103, 390 S.E.2d 376, 378 (Ct.App.1990) (defining consortium as "the conjugal society, comfort, companionship, and affection of each other").

162, 311 S.E.2d 730, 732 (1984) (same); *Wooten v. Amspacher*, 279 S.C. 325, 326, 307 S.E.2d 232, 233 (1983) (holding evidence of remarriage is improper in survival action).

In the present case, the trial court did not abuse its discretion in excluding the evidence of the extra-marital affair. *See Rawlinson Rd. Homeowners Ass'n, Inc. v. Jackson*, 395 S.C. 25, 35, 716 S.E.2d 337, 343 (Ct.App.2011) ("An abuse of discretion occurs when the trial court's decision is unsupported by the evidence or controlled by an error of law."). Despite some ambiguity in the ruling,[9] we find the trial court properly concluded the probative value of the evidence was substantially outweighed by its prejudicial effect under Rule 403, SCRE, for both liability and damages.

Here, Sean's affair occurred in 1999, two to three years before Kelly's death, and no evidence suggests more affairs occurred or were occurring at the time of her death. Additionally, after Sean confessed to Kelly, they remained married and moved to South Carolina together. Finally, the trial court concluded the probative value of the evidence was substantially outweighed by its prejudicial effect. *See Busillo v. City of North Charleston*, 404 S.C. 604, 610–11, 745 S.E.2d 142, 146 (Ct.App.2013) (noting "a trial court has particularly wide discretion in ruling on Rule 403 objections" and should be reversed only in exceptional circumstances). Accordingly, we find the trial court did not abuse its discretion in excluding the evidence of the affair.

## IV. Enrollment of Judgment

■ Dr. Law contends the trial court erred in refusing to enroll the judgment using the jury's determination of fault and

---

9. The trial court stated,

   I'm going to deny the Defendants the right to bring that evidence in, and exclude that evidence. I do that for this reason, it's clear from the opening arguments that this case is really about liability. It's not about damages. This issue of an affair really goes to damages, in the Court's opinion, and whether or not the loss of the spouse is as great as one may perceive that it is.... I'm just simply saying that that issue goes mainly to damages, not really to liability, but if it does go to liability, if the Defendants take the position that the truth of Mr. Fay and the reliability is directly an issue, credibility and reliability are directly an issue, I find under Rule 403 that that is so prejudicial that it is inappropriate because it is of minimal probative value, but high prejudicial value, and thus I'm going to exclude it.

instead using joint and several liability when the record contains clear evidence of an agreement by the parties, Sean in particular, to accept an apportioned verdict. We disagree.

In 1988, the General Assembly enacted the South Carolina Uniform Contribution Among Tortfeasors Act (the Act), which provided for contribution between multiple tortfeasors who were jointly and severally liable for a common liability, abrogating the common law rule against contribution. *Vermeer Carolina's Inc. v. Wood/Chuck Chipper Corp.*, 336 S.C. 53, 68, 518 S.E.2d 301, 309 (Ct.App.1999); S.C.Code Ann. §§ 15–38–10 to –70 (2005 and Supp.2014). In 1991, our supreme court abolished the doctrine of contributory negligence and adopted comparative fault as the tort standard, permitting a plaintiff to recover if his or her negligence did not exceed that of the defendant or the combined negligence of multiple defendants. *Nelson v. Concrete Supply Co.*, 303 S.C. 243, 244–45, 399 S.E.2d 783, 784 (1991).

Nonetheless, the appellate courts of South Carolina have reaffirmed the applicability of joint and several liability among multiple tortfeasors. *Branham v. Ford Motor Co.*, 390 S.C. 203, 235–36, 701 S.E.2d 5, 22–23 (2010); *see also Summer v. Carpenter*, 328 S.C. 36, 48, 492 S.E.2d 55, 61 (1997); *Am. Fed. Bank, FSB v. No. One Main Joint Venture*, 321 S.C. 169, 175–76, 467 S.E.2d 439, 442–43 (1996); *Fernanders v. Marks Constr. of S.C., Inc.*, 330 S.C. 470, 475–78, 499 S.E.2d 509, 511–13 (Ct.App.1998). In 2005, the General Assembly enacted an amendment to permit apportionment of fault among multiple tortfeasors; however, it did not become effective until July 1, 2005. S.C.Code Ann. § 15–38–15 (Supp.2014) (noting the section became effective July 1, 2005).

The trial court initially granted Dr. Law's Rule 59(e) motion in part and ordered the Clerk to enroll the judgment using the percentages of fault determined by the jury.

However, after a telephone conference with all parties, the trial court vacated its prior order and stated:

The Court is now aware that the previous Order was incorrect when it stated that the parties agreed to be bound by the allocation of specific percentages of negligence found by the jury. The Court recognized its mistake after conducting a phone conference involving counsel for all the

parties. Therefore, there was no basis for the Court to direct the Clerk to reform the verdict based upon these percentages of negligence and to enroll the verdict accordingly. The law in effect at the time of the incident that gave rise to this suit requires joint and several liability, and in absence of agreement to the contrary, this Court must follow that law.

The trial court's final order clearly finds no agreement between the parties and confirms the law in effect at the time of the injury must be applied in the absence of an agreement. The record supports the trial court's finding, and because the injury occurred in 2002 before the effective date of the Act's amendment, we affirm the trial court's enrollment of the judgment using joint and several liability.

## CONCLUSION

The trial court's grant of Dr. Young's motion for a directed verdict, denial of Dr. Law's motion for JNOV, exclusion of the evidence of the extra-marital affair, and enrollment of the judgment using joint and several liability are

**AFFIRMED.**

SHORT and GEATHERS, JJ., concur.