24452

Michael Anthony ELLIS, Deceased, By Deborah Scott Ellis, as Personal Representative of the Estate of Michael Anthony Ellis, Respondent v. David L. OLIVER, M.D., Appellant.

(473 S.E. (2d) 793)

Supreme Court

*Kay G. Crowe* and *R. Lewis Johnson, Barnes, Alford, Stork & Johnson, LLP,* Columbia, *for appellant.*

*Kimberly A. Raber,* Columbia; *Michael J. Miller* and *Deborah A. Vitale,* Alexandria, Virginia, *for respondent.*

Heard Apr. 16, 1996.

Decided June 17, 1996. Reh. Den. Aug. 23, 1996.

BURNETT, Justice:

This is a medical malpractice action in which the jury returned a verdict in favor of respondent. We affirm.

## FACTS

On October 3, 1988, Michael Anthony Ellis was severely injured in a one-car accident. The paramedics who arrived at the scene of the accident administered first aid and immobilized Ellis by placing him in a cervical collar and securing him to a rigid board. The paramedics then transported Ellis to Richland Memorial Hospital's trauma center. The initial examination at the hospital revealed Ellis had suffered, among other things, closed head trauma, a fractured scapula, a torn right brachial plexus, and a cervical spine injury. Although Ellis could no longer move his right arm because of the torn brachial plexus, Ellis had some voluntary movement of the left arm, pain reflexes in his legs, and rectal tone, an indication he was not paralyzed below the waist.

Because of Ellis' closed head injury, the chief surgical resident Dr. William Moore called for an anesthesiologist to establish an airway in order to reduce the swelling of Ellis' brain by means of hyperventilation. Dr. David L. Oliver (Appellant) responded and was informed of Ellis' condition by Dr. Moore.

Thereafter, appellant made five attempts to establish an airway by inserting a tube through Ellis' nasal passage. When these attempts failed, appellant made five unsuccessful attempts at oral intubation using a laryngoscope, an instrument placed into the patient's mouth to visualize the trachea so that a tube can be passed into the windpipe.[1] Following these attempts by appellant and one further unsuccessful attempt by Dr. Moore, Dr. Moore established a surgical airway by making an incision in Ellis' neck and windpipe and inserting a tube directly into Ellis' trachea. The following day, it was discovered that Ellis had suffered a spinal cord injury rendering him a quadriplegic.

In 1990, Ellis brought this medical malpractice action against appellant.[2] Shortly thereafter, Ellis died from a blood infection allegedly related to his quadriplegia. Consequently, Deborah Scott Ellis (Respondent) was substituted as plaintiff and amended the complaint to allege survival and wrongful death causes of action. At the conclusion of a trial held in 1994, a jury returned returned a verdict in favor of respondent.[3]

## ISSUES

(1) Did respondent present sufficient evidence to establish the requisite causal connection between appellant's acts and Michael Ellis' injuries?

(2) Did the trial court err in admitting into evidence an ambulance run report and certain medical records under the business records exceptions to the hearsay rule?

(3) Did the trial court err in allowing respondent's experts to give opinions based in part on hearsay statements and deposition testimony taken in other proceedings?

---

[1] The first attempt at oral intubation was made while Ellis remained in the cervical collar. The second attempt was made after appellant loosened the front of the collar so he could move Ellis' jaw. The third attempt was made after appellant removed the front of the collar and administered a drug to completely relax Ellis' muscles. For the fourth and fifth attempts, appellant used different size blades on the laryngoscope.

[2] Ellis also brought actions against two other physicians and Richland Memorial Hospital. Although all three cases were originally consolidated to be heard in Richland County, venue for this case was transferred to Lexington County. *See Ellis v. Oliver,* 307 S.C 365, 415 S.E. (2d) 400 (1992). The action against Richland Memorial eventually settled.

[3] The jury awarded $288,898 in the wrongful death action and $411,102 in the survival action.

(4) Did the trial court err in allowing certain testimony concerning the applicable standard of care?

(5) Did the trial court err in excluding evidence of Ellis' pre-existing medical conditions and in admitting certain medical bills?

## DISCUSSION

### (1) *Proximate Cause*

Appellant first argues the trial court erred in not granting a directed verdict or a judgment notwithstanding the verdict because respondent failed to present sufficient evidence to establish the requisite causal connection between appellant's acts and Ellis' injuries. Specifically, appellant argues respondent's expert failed to present sufficient evidence that Ellis' injuries "most probably" resulted from the alleged negligence of appellant. We disagree.

In a medical malpractice action, it is incumbent on the plaintiff to establish proximate cause as well as the negligence of the physician. *Armstrong v. Weiland,* 267 S.C. 12, 225 S.E. (2d) 851 (1976). Negligence is not actionable unless it is a proximate cause of the injury complained of, and negligence may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided. *Hughes v. Children's Clinic, P.A.,* 269 S.C. 389, 237 S.E. (2d) 753 (1977). When one relies solely upon the opinion of medical experts to establish a causal connection between the alleged negligence and the injury, the experts must, with reasonable certainty, state that in their professional opinion, the injuries complained of most probably resulted from the defendant's negligence. *Armstrong v. Weiland, supra.* The reason for this rule is the highly technical nature of malpractice litigation. Since many malpractice suits involve ailments and treatments outside the realm of ordinary lay knowledge, expert testimony is generally necessary. When it is the only evidence of proximate cause relied upon, it must provide a significant causal link between the alleged negligence and the plaintiff's injuries, rather than a tenuous and hypothetical connection. *Green v. Lilliewood,* 272 S.C. 186, 249 S.E. (2d) 910 (1978).

In this case, respondent's first expert, Dr. Morris Pulliam, testified about the standard of care for physicians attempting to intubate a patient with a known or suspected cervical spine injury in a situation where establishing an airway is not "urgent."[4] Dr. Pulliam stated that in his opinion, appellant violated this standard of care by inappropriately and excessively attempting to intubate Ellis orally. According to Dr. Pulliam, one attempt at oral intubation without moving the patient would have been acceptable, but multiple attempts using a laryngoscope was a violation of the standard of care because such a procedure inevitably causes movement of the patient's head and neck. As for causation, Dr. Pulliam stated that his review of the medical records indicated Ellis did not become a quadriplegic because of the motor vehicle accident. Dr. Pulliam specifically testified it was his opinion, to a reasonable degree of medical certainty, that the injury to Ellis' spinal cord occurred during the oral intubation attempts, and that this injury resulted in quadriplegia and eventual death. Further, Dr. Pulliam testified that in his opinion, had appellant not made multiple attempts at oral intubation, Ellis would have walked out of the hospital within two or three weeks.

Respondent's second expert, Dr. Brian McAlary, also testified about the standard of care for physicians attempting to intubate a patient with a known or suspected cervical spine injury. He stated that appellant violated this standard by making multiple attempts at oral intubation using in-line traction.[5] Dr. McAlary also stated that appellant violated the standard of care by allowing the resident Dr. Moore to attempt oral intubation following the first five unsuccessful attempts by appellant. Further, Dr. McAlary testified it was his opinion, to a reasonable degree of medical certainty, that Ellis' quadriplegia was not directly related to the injuries sustained in the motor vehicle accident, but was the direct result of the "unacceptable manipulation" of Ellis' airway following the accident.

---

[4] Dr. Pulliam testified that although an artificial airway needed to be established, Ellis' situation was not "urgent" because Ellis was receiving a sufficient amount of oxygen by means of "bagging."

[5] Following the attempts at intubation, appellant noted in a report that he and Dr. Moore used in-line "traction," which Dr. McAlary defined as a "pulling on the head." However, appellant maintained the term "traction" was used in the report synonymously with the term "stabilization" or immobilization, and that no "pulling on the head" occurred.

Dr. McAlary based his opinion on a review of the medical records which indicated Ellis had no spinal cord disfunction prior to the attempts at intubation, and and that Ellis showed signs of neurogenic shock[6] during the intubation attempts. In addition, Dr. McAlary testified that a comparison of X-rays taken before and after the intubation attempts indicated greater displacement between the second and third cervical vertebrae of Ellis' spine.

Assuming the only evidence of a causal connection was the testimony of Dr. Pulliam and Dr. McAlary, we find this testimony, when viewed in a light most favorable to respondent, was sufficient to show that Ellis' injuries (i.e. quadriplegia) most probably resulted from the alleged negligence of appellant.[7] *See Baughman v. American Tel. & Tel. Co.*, 306 S.C. 101, 410 S.E. (2d) 537 (1991) (in determining whether expert medical testimony is sufficient to establish causation, it is not necessary that the expert actually use the words "most probably"). Consequently, the circuit court did not err in denying appellant's motions for a directed verdict or judgment notwithstanding the verdict. *See Unlimited Services, Inc. v. Macklen Enterprises, Inc.*, 303 S.C. 384, 401 S.E. (2d) 153 (1991) (the denial of a motion for a directed verdict or judgment non obstante veredicto will be upheld if the evidence, when viewed in a light most favorable to the nonmoving party, is susceptible of more than one reasonable inference).

(2) *Ambulance Report and Medical Records*

The two paramedics who treated Ellis and transported him to the hospital testified at trial. One of the paramedics, Greg Randall, testified that after Ellis was transported, he (Randall) filled out an "Ambulance Run Report" required by the Department of Health and Environmental Control. A copy of the report was marked for identification and, without objection, the trial court allowed Randall to use the report to refresh his memory about Ellis' accident.[8] Referring to the report, Randall testified as follows:

---

[6] Neurogenic shock was defined by Dr. McAlary as a sudden drop in blood pressure and a slowing of the heart rate caused by an injury to the nervous system, particularly the spinal cord.

[7] The testimony of Dr. Pulliam and Dr. McAlary was sufficient to establish the requisite causal connection even though neither expert could identify the specific intubation attempt or attempts which caused Ellis' injuries.

[8] Ellis' accident occurred approximately six years before trial.

A. . . . . I got down here he had a normal range of movement with no deformity found.

Q. And based on the training you had had up to that point in time, what did a normal range of motion then mean to you sir?

A. That he had movement in his extremities, or some of the extremities had been moved.

\* \* \* \* \*

Q. Would you have written the word "norm" n-o-r-m, or the acronym norm in your report if this man were paralyzed at the scene of the accident?

A. No, ma'am.

\* \* \* \* \*

Q. Was the ambulance run report that you filled out and that you signed, did that report accurately reflect the observations you made between the time you got to the scene and the time you transported the patient to the hospital.

A. As far as I can remember, yes, ma'am.

\* \* \* \* \*

Q. Were these entries made at the time you saw the events you observed or contemporaneously with your seeing those events, or shortly thereafter?

A. Shortly thereafter, I would imagine.

Thereafter, over appellant's objection, the trial court allowed respondent to introduce the entire ambulance report into evidence under the business record exception to the hearsay rule. Appellant argues that admitting the entire report was error because the notation in the report indicating Ellis had normal range of motion was a subjective opinion or judgment of the paramedic and was therefore inadmissible. Appellant also argues the trial court erred in admitting an emergency room report which contained a physician's notation that Ellis had good rectal tone upon admission. We disagree.

Initially, whether or not the ambulance report was admissible under the business record exception, it was admissible because the report was completed by the witness Randall contemporaneously with his observations of the accident and was properly used by him to refresh his memory regarding the accident. *See Gwathmey v. Foor Hotel Co.*, 121 S.C. 237, 113 S.E. 688 (1922) (memorandum properly

used to refresh witness' memory held admissible into evidence).[9] Further, in light of Randall's testimony, we fail to see any prejudice from the admission of the report itself.

In any event, the notation in the report indicating Ellis ■ "had movement in his extremities, or some of [his] extremities had been moved," was merely an observation of Ellis' condition and not a subjective opinion or judgment. In addition, the notation in the emergency room report that Ellis had good rectal tone was also an observation of Ellis' condition and not a subjective opinion or judgment. Consequently, the trial court did not err in overruling appellant's objections to admitting the entire ambulance report or the emergency room report. *See State v. Key*, 277 S.C. 214, 284 S.E. (2d) 781 (1981) (medical report containing purely factual observations held admissible in its entirety).[10]

### (3) *Basis of Expert Opinions*

Appellant argues the trial court erred in allowing respondent's expert to state their opinions on the issue of causation because the opinions were based in part on inadmissible hearsay statements in Ellis' medical records and deposition testimony taken in an action to which appellant was not a party (see footnote 2). We disagree.

The hearsay statements appellant argues were inad- ■ missible and could not form the basis of opinion testimony include the written statement made by the paramedic in the ambulance report indicating Ellis had movement in his extremities, and the written statement made by the physician in the emergency room report that indicated Ellis had good rectal tone upon admission to the hospital. As noted above, however, the trial court committed no error in admitting these statements into evidence. Further, whether or not the statements were admitted at trial, or even admissible at trial, it is undisputed that in forming opinions about a patient, medical experts routinely rely on the patient's medical

---

[9] We note that Rule 803(5), SCRE, which became effective after appellant's trial, states that such a memorandum may not be introduced as an exhibit unless offered by the adverse party. As the Comments to Rule 803 point out, this represents a change in South Carolina law.

[10] Appellant does not argue that either the ambulance report or the emergency room report was inadmissible because it was not kept in the course of a regularly conducted business activity, or that it was not the regular practice or paramedics or physicians to fill out such reports.

records. Consequently, there was nothing improper in allowing respondent's experts to give opinions based in part on the statements in Ellis' medical records. *See* Rule 703, SCRE (in giving an opinion, an expert may rely on facts or data which are not admitted in evidence or even admissible in evidence).[11]

As for the depositions taken in the other action, appellant contends that Rule 32(a), SCRCP, prohibits any use of these depositions to form the basis of an expert opinion. We disagree.

■ Initially, we note that the depositions relied on by respondent's experts in giving their opinions were depositions of individuals who testified at trial and were therefore subject to direct and cross-examination by appellant. In any event, Rule 32, SCRCP, governs the use of depositions *as evidence* at trial or at a hearing. The rule does not, however, prohibit an expert from relying on depositions to form the basis of an opinion. Such use is governed by Rule 703, SCRE.[12] Under this Rule, the deposition testimony of those medical professionals involved in the care of Michael Ellis following his accident could be used to form the basis of opinion testimony by respondent's experts regarding the issues of negligence and causation.

### (4) *Standard of Care*

In testifying that appellant violated the applicable standard of care by making multiple attempts at oral intubation using in-line traction, respondent's experts referred several times to the 1988 Advanced Trauma Life Support (ATLS) Manual and the ATLS course. In his brief, appellant argues the trial court erred in allowing the experts to testify that the ATLS Manual "constituted the applicable standard of care" because the manual does not specifically limit the number of attempts at oral intubation for a patient with a cervical spine injury. A review of the record, however, indicates that respondent's experts did not testify that the ATLS Manual "constituted the applicable standard of care." Rather, the experts specifically stated that they did not base their opinion about the standard of care solely on the ATLS Manual itself because the manual was merely a guide to the logical approach a physician should

---

[11] Formerly Rule 43(m)(2), SCRCP.
[12] Formerly Rule 43(m)(2), SCRCP.

take when faced with a patient requiring intubation. Consequently, appellant's argument on this issue is without merit.

### (5) *Medical Records and Bills*

Ellis incurred numerous medical expenses following his accident. At trial, respondent moved to introduce Ellis' medical bills into evidence. Appellant objected arguing that some of the bills were not directly related to the injuries allegedly caused by appellant's negligence. Appellant also objected arguing that he should not be held responsible for the bills because the bills were not debts against Ellis' estate. The trial court overruled these objections but required respondent's expert to go line-by-line over the bills to determine which items were, in his opinion, directly related to Ellis' quadriplegia.

On appeal, appellant first argues the trial court erred in overruling the objections to the bills because this placed the burden on him to "disprove the connection [between each bill and the alleged negligence] rather than requiring [respondent] to carry her  affirmative burden of proving [a] connection." This argument is patently without merit. As stated above, the  trial court specifically required *respondent* to prove which bills were directly related to Ellis' quadriplegia.

Next, appellant argues the trial court erred in admitting bills allegedly unrelated to appellant's negligence. This argument is also without merit. First, appellant's brief fails to identify any bills introduced at trial that were unrelated to the alleged negligence. Second, the only evidence presented at trial regarding the bills was Dr. McAlary's testimony that he reviewed each bill line-by-line to determine which items were directly related to appellant's negligence. Only those items that Dr. McAlary testified were directly related to appellant's negligence were submitted to the jury.

Appellant also argues the trial court erred in admitting into evidence certain unspecified bills because they had not been paid by either Ellis or his estate and were no longer debts of the estate. We disagree. Whether or nor these bills were debts of the estate, they were still admissible to show the extent of pain and suffering Ellis endured as  the result of appellant's alleged negligence. Whether respondent could properly recover for such bills, however, is an issue that was not pre-

served for review in this case as appellant failed to present any evidence regarding which bills, if any, had been discharged and were no longer debts of the estate.

Finally, appellant argues the trial court erred in not allowing him to introduce unspecified records that showed Ellis' medical condition prior to the accident. Appellant contends these records were relevant on the issue of damages because the records indicated Ellis was taking pain medication prior to his accident and therefore all of the pain Ellis suffered as a quadriplegic could not be attributable to appellant's conduct. However, appellant failed to proffer which records he sought to introduce. Consequently, this issue is not preserved for review. *See Greenville Memorial Auditorium v. Martin*, 301 S.C. 242, 391 S.E. (2d) 546 (1990) (failure to make proffer of excluded evidence precludes review on appeal).

For the foregoing reasons, the judgment below is

Affirmed.

FINNEY, C.J., and TOAL, MOORE and WALLER, JJ., concur.