661 S.E.2d 113

Jamia HOARD, a minor under the age of fourteen years, by Karen Elizabeth Hoard, her mother, Appellant,

v.

ROPER HOSPITAL, INC.; Carolina Care Alliance; Karen Johnson; Robert H. Smith, M.D.; Marshall Goldstein, M.D.; and John Doe and Mary Roe, representing one or more unknown parties, Defendants,

of whom: Robert H. Smith, M.D., is the Respondent.

Karen Elizabeth Hoard and William Dwight, Appellants,

v.

Roper Hospital, Inc.; Carolina Care Alliance; Karen Johnson; Robert H. Smith, M.D.; Marshall Goldstein, M.D.; and John Doe and Mary Roe, representing one or more unknown parties, Defendants,

of whom: Robert H. Smith, M.D., is the Respondent.

No. 4377.

Supreme Court of South Carolina.

March 27, 2008.
Heard March 5, 2008.
Decided March 27, 2008.
Refiled April 24, 2008.
Rehearing Denied May 22, 2008.

504

506

Coming B. Gibbs, Jr., Cameron Marshall, and Paul N. Uricchio, all of Charleston, for Appellants.

Andrew F. Lindemann, of Columbia, M. Dawes Cooke, Jr., and P. Gunnar Nistad, both of Charleston, for Respondents.

PER CURIAM:

In this medical malpractice action, Jamia Hoard and her parents, Karen Elizabeth Hoard and William Dwight (collectively the Hoards), appeal the trial court's grant of summary judgment to Dr. Robert H. Smith on their cause of action for medical malpractice. The Hoards assert they provided evidence Dr. Smith was a proximate cause of Jamia's injuries. We reverse.

## FACTS

Jamia was born on March 30, 2002, at Roper Hospital (the Hospital) in Charleston. Shortly thereafter, she developed a respiratory condition and was transferred to a level II nursery,[1] where Dr. Marshall Goldstein, a neonatologist,[2] was her primary physician. Jamia's condition necessitated an intravenous line to administer medication and fluids. Because the nursing staff was unable to start a peripheral intravenous line, Dr. Goldstein ordered Karen Johnson, a certified neonatal nurse practitioner, to place an umbilical intravenous line.[3] Johnson placed the line on the afternoon of March 30, 2002.

---

1. Nurseries can be distinguished based on the needs of an infant and the abilities of a facility. Level II nurseries provide care for infants who need more help or closer monitoring than a Level I nursery can provide. Infants in Level II nurseries may need intravenous fluids or medications, assistance to maintain their body temperature, feeding assistance, or monitoring for sleep apnea. Level III nurseries or newborn intensive care units (NICUs) provide even greater care to infants, including subspecialty services, the use of ventilators, close observation of infants whose condition is unstable, and care following surgery.

2. Neonatology is a subspecialty of pediatric medicine, concerning the care and treatment of newborns.

3. An umbilical intravenous line is a catheter that is placed in the vein of the umbilical cord.

When inserted eleven to thirteen centimeters, the optimal location for such a catheter, the line would not draw[4] blood. Nurse Johnson then placed the line at fourteen centimeters. Following the Hospital's protocol, a chest x-ray was taken on March 30 to confirm the position of the line.

The next morning, Dr. Smith, a radiologist, reviewed Jamia's chest x-ray and prepared a report stating, "An umbilical vein catheter has been placed. The tip terminates high within the right atrium. There are persistent bilateral coarse infiltrates essentially unchanged compared with the prior one. No pneumothorax is seen." Dr. Smith's report was approved at 10:34 a.m. and sent to Jamia's floor. At 2 p.m. that afternoon Dr. Goldstein reviewed Dr. Smith's report. He did not adjust the placement of the line.

At 4:15 a.m. on April 1, Jamia went into cardiac arrest. Jamia was transferred to the neonatal intensive care unit[5] of the Medical University of South Carolina (MUSC) where it was determined the wall of the right atrium was perforated allowing blood and intravenous fluid to fill the pericardial sac around the heart, effectively causing tamponade.[6] MUSC physicians ascertained that the umbilical intravenous line most likely eroded the wall of the heart a few hours prior to the cardiac arrest, and as a result Jamia suffered severe brain damage.

Jamia and her parents separately filed professional negligence actions against the Hospital; Carolina Care Alliance, the owner and operator of the Hospital; Nurse Johnson; Dr. Smith; and Dr. Goldstein. The Hoards asserted Dr. Smith violated his standard of care by failing to note in his x-ray report the line was improperly placed and this failure was a proximate cause of Jamia's injuries. The Hoards claimed Dr.

---

4. A catheter "draws" when you exert negative pressure on the catheter and blood flows out of the body through the catheter.

5. MUSC's neonatal intensive care unit is the region's Level III care facility.

6. Tamponade is the restriction of heart function by fluid in the pericardial sac.

Goldstein may not have known the line was improperly placed and if Dr. Smith had alerted him to the placement, Dr. Goldstein would have moved the line, and prevented the cardiac arrest.

In his deposition, Dr. Paul Koenigsberg, a radiologist from Florida, testified that Dr. Smith violated the standard of care by failing to note on the chart or notify someone the line was improperly placed. Dr. Goldstein testified he knew the line was not optimally placed but chose not to reposition it for several reasons, including the line's proven efficacy over twenty-two hours and the possibility of moving a blood clot that may have formed at the tip of the line. Dr. Anne Hansen, an assistant professor at Harvard University Medical School, described Dr. Goldstein's reasons for not moving the line as a non-valid concern.

The Hoards settled their claims with the Hospital, Carolina Care Alliance, Nurse Johnson, and Dr. Goldstein. Dr. Smith made a motion for summary judgment. The trial court granted the motion, finding the Hoards did not provide evidence Dr. Smith was a proximate cause of Jamia's injuries. The Hoards' motion for amendment of judgment was denied. This appeal followed.

## STANDARD OF REVIEW

When reviewing the grant of a summary judgment motion, this court applies the same standard which governs the trial court under Rule 56(c), SCRCP: summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fleming v. Rose*, 350 S.C. 488, 493, 567 S.E.2d 857, 860 (2002). In determining whether a triable issue of fact exists, the evidence and all factual inferences drawn from it must be viewed in the light most favorable to the nonmoving party. *Sauner v. Pub. Serv. Auth.*, 354 S.C. 397, 404, 581 S.E.2d 161, 165 (2003). If evidentiary facts are not disputed but the conclusions or inferences to be drawn from them are, summary judgment should be denied. *Baugus v. Wessinger*, 303 S.C. 412, 415, 401 S.E.2d 169, 171 (1991).

## LAW/ANALYSIS

██ The Hoards contend the trial court erred in granting Dr. Smith's motion for summary judgment because they provided evidence Dr. Smith was a proximate cause of Jamia's injuries. The Hoards assert a jury could have disregarded Dr. Goldstein's testimony and found Dr. Smith's failure to alert Dr. Goldstein of the line's position was a proximate cause of Jamia's injuries. We agree.

██ "Medical malpractice lawsuits have specific requirements that must be satisfied in order for a genuine factual issue to exist." *David v. McLeod Reg'l Med. Ctr.*, 367 S.C. 242, 247, 626 S.E.2d 1, 3 (2006). Specifically, a plaintiff alleging medical malpractice must provide evidence showing: (1) the generally recognized and accepted practices and procedures that would be followed by average, competent practitioners in the defendant's field of medicine under the same or similar circumstances, and (2) the defendant departed from the recognized and generally accepted standards. *Jones v. Doe*, 372 S.C. 53, 61, 640 S.E.2d 514, 518 (Ct.App.2006). Additionally, the plaintiff must demonstrate the defendant's departure from such generally recognized practices and procedures proximately caused the plaintiff's alleged injuries and damages. *David*, 367 S.C. at 248, 626 S.E.2d at 4.

██ If the subject matter does not lie within common knowledge but requires special learning to evaluate the conduct of the defendant, then the plaintiff must offer expert testimony to establish both the required standard of care and the defendant's failure to conform to that standard. *Id.* Because "many malpractice suits involve ailments and treatments outside the realm of ordinary lay knowledge, expert testimony is generally necessary." *Ellis v. Oliver*, 323 S.C. 121, 125, 473 S.E.2d 793, 795 (1996). When plaintiffs rely solely upon medical expert testimony as the only evidence of proximate cause, the medical expert must, with reasonable certainty, state it is their opinion the injuries complained of most probably resulted from the defendant's negligence. *Id.* The testimony "must provide a significant causal link between the alleged negligence and the plaintiff's injuries, rather than a tenuous and hypothetical connection." *Id.*

For this court to reverse grants of summary judgment, plaintiffs must have provided some evidence for each element of their claims. In the present case, the Hoards must have presented evidence Dr. Smith violated the standard of care and that violation was a proximate cause of Jamia's injuries.

1. The Hoards presented evidence regarding a radiologist's standard of care and violations of that standard. Dr. Koenigsberg testified radiologists have a duty and standard of care to immediately convey urgent information to the person who ordered the film. He also testified it would be outside a radiologist's standard of care to not directly communicate to the treating physician or his nurses that an umbilical venous line was not properly positioned. Another radiologist from Florida, Dr. Rodan, testified that when a radiologist sees a line high in the right atrium, to be within the standard of care, he should state his impression there is a deviation from the normal placement of a line. Dr. Rodan further stated "if there is a malposition it needs to be stated in such language that the referring physician knows that it's in an inappropriate location and that they should consider doing something such as repositioning the catheter."

Accordingly, the Hoards provided evidence to support their assertion Dr. Smith violated the standard of care, and we turn our examination to whether there is evidence Dr. Smith was a proximate cause of Jamia's injuries.

2. The Hoards claim Dr. Smith's failure to alert Dr. Goldstein to the position of the line was a proximate cause of Jamia's injuries. Dr. Smith asserts the Hoards did not provide any evidence of proximate cause because Dr. Goldstein testified he knew the line was not optimally positioned. However, a jury could have chosen not to believe Dr. Goldstein's testimony. Simply because testimony is uncontradicted does not render it undisputed. *Black v. Hodge,* 306 S.C. 196, 198, 410 S.E.2d 595, 596 (Ct.App.1991). The question of the inherent probability of the testimony and the credibility of the witness remains. *Id.* Even when evidence is not contradicted, the jury may believe all, some, or none of the testimony and the matter is properly left to the jury to decide. *Ross v. Paddy,* 340 S.C. 428, 434, 532 S.E.2d 612, 615 (Ct.App.2000).

When asked if Dr. Smith's alleged failure to communicate orally with Dr. Goldstein in any way caused the cardiac arrest, Dr. Koenigsberg explained if there was a delay between the placement of the line and the time at which the treating physicians realized the line was in an abnormal position, that could have caused the pericardial effusion. Dr. Koenigsberg also stated he believed Dr. Smith was negligent for failing to call someone responsible for Jamia's care and inform them the tip of the catheter was in an abnormal position. Dr. Koenigsberg testified if Dr. Goldstein knew of the line's placement prior to the line perforating the wall of the heart and had the opportunity to pull the line back before injury occurred, Dr. Smith did not cause the pericardial effusion.[7] However, Dr. Koenigsberg also responded affirmatively when asked, "Is it your opinion that Dr. Smith's alleged failure to orally communicate with Jamia Hoard's health care personnel, caused her to have a pericardial effusion?"

In addition, Dr. Rodan testified, "I think the lack of completeness of [Dr. Smith's] report did contribute to the complications that occurred to the patient." Assuming Dr. Goldstein did not know the location of the catheter's tip was outside the standard of care, Dr. Rodan testified Dr. Smith's failure to point out the deviation from the standard of care was "a contributing cause to the complications that occurred." Dr. Rodan believed "some of the complications that ... occurred may be a direct responsibility of the radiologist because of his inadequate report."

An examination of the record shows the Hoards provided evidence supporting their assertion Dr. Smith was a proximate cause of Jamia's injuries. Accordingly, the order of the trial court is

**REVERSED.**

ANDERSON and SHORT, and THOMAS, JJ., concur.

---

7. Pericardial effusion is an accumulation of fluid in the pericardial sac.