694 S.E.2d 1

Jamia HOARD, a minor under the age of fourteen years, by Karen Elizabeth HOARD, her Mother, Respondent,

v.

ROPER HOSPITAL, INC., Carolina Care Alliance, Karen Johnson, Robert H. Smith, M.D., Marshall Goldstein, M.D. and John Doe and Mary Roe, representing one or more unknown parties, Defendants,

of whom Robert H. Smith, M.D., is the Petitioner.

Karen Elizabeth Hoard and William Dwight, Respondents,

v.

Roper Hospital, Inc., Carolina Care Alliance, Karen Johnson, Robert H. Smith, M.D., Marshall Goldstein, M.D. and John Doe and Mary Roe, representing one or more unknown parties, Defendants,

of whom Robert H. Smith, M.D., is the Petitioner.

No. 26813.

Supreme Court of South Carolina.

Heard March 2, 2010.

Decided May 3, 2010.

Rehearing Denied June 24, 2010.

540

Andrew F. Lindemann, of Davidson & Lindemann, of Columbia, M. Dawes Cooke, Jr. and John A. Jones, of Barnwell Whaley Patterson & Helms, of Charleston, for Petitioner.

Cameron Lee Marshall, of Charleston, and Coming B. Gibbs, Jr., of Gibbs & Holmes, of Charleston, for Respondents.

Justice KITTREDGE.

In this medical malpractice case, the court of appeals reversed the trial court's grant of summary judgment in favor of Petitioner Robert Smith, M.D. We granted a writ of certiorari to review the court of appeals decision in *Hoard v. Roper Hospital, Inc.*, 377 S.C. 503, 661 S.E.2d 113 (Ct.App.2008). We reverse the decision of the court of appeals and reinstate the trial court's order granting summary judgment to Dr. Smith.

## I.

Shortly after Jamia Hoard was born at Roper Hospital in Charleston, South Carolina on March 30, 2002, she developed respiratory distress and was transferred from the Level 1 newborn nursery to the Level 2 nursery. Jamia's treating physician was Marshall Goldstein, M.D., a board-certified neonatologist. Dr. Goldstein determined it was necessary for Jamia to have a peripheral intravenous line (IV) for infusion of medications and fluids and for withdrawal of blood for testing. After nurses were unable to place the IV, Dr. Goldstein ordered pediatric nurse practitioner Karen Johnson to insert an umbilical vein catheter (UVC).[1]

A chest X–ray was taken prior to insertion of the UVC. Johnson initially advanced the UVC to a depth of 11 to 13 centimeters. Because the UVC was not drawing blood, Johnson inserted it deeper into Jamia's chest. A second X–ray was made to confirm whether the UVC was placed properly. When Johnson read the second X–ray, she did not observe a problem with the UVC placement. The X–rays were sent to the radiology department for review by a radiologist.

The next morning, the on-call radiologist, Robert Smith, M.D., read Jamia's X–rays. Dr. Smith's written report stated: "An umbilical vein catheter has been placed. The tip terminates high within the right atrium. There are persistent bilateral coarse infiltrates essentially unchanged compared with the prior exam. No pneumothorax is seen." At 10:34 a.m., Dr. Smith sent the X–rays and his report to the nursery.

---

1. An umbilical vein catheter (UVC) is inserted into the large vein that travels thorough the umbilical cord.

When Dr. Goldstein made rounds that afternoon at 2:00 p.m., he examined Jamia, reviewed her lab results and X–rays, and read Dr. Smith's radiology report. Following this examination, Dr. Goldstein wrote a note in Jamia's chart in which he stated the UVC was placed "in approximately [the] right atrium."

At approximately 4:00 a.m. the next day, April 1, Jamia went into cardiac arrest. The nursing staff called Dr. Goldstein, who instructed staff to pull the UVC back and to transfer Jamia immediately to the Level 3 nursery at the Medical University of South Carolina (MUSC).[2] At MUSC, neonatologists determined Jamia was experiencing "cardiac tamponade," a potentially fatal syndrome.[3]

In her deposition, neonatologist Anne Hansen, M.D. explained that the tip of the UVC slowly eroded the wall of the right atrium. Hansen explained that the fluid, which was being infused on a continuous basis, was filling the pericardial sac instead of going into the bloodstream. Ultimately, the volume of fluid surrounding the heart rendered it unable to properly expand and contract. Hansen described the process that led to Jamia's cardiac arrest:

> [T]he fluid actually [comes] out of the tip of the [UVC] causing a perforation through the atrium wall and then this fluid filling up this potential space between the pericardial sac and the [heart] muscle. . . . So here is this line with intravenous fluid coming through. [B]etween the plastic itself and the fluid eroding, eroding, eroding until it erodes all the way through the [heart] muscle wall. And then it accumulates and pushes this sac away and pushes the heart muscle in and causes a pressure build up all the way around the heart.

. . . .

2. MUSC has the only Level 3 nursery in the Charleston-area.

3. "Cardiac tamponade" is the mechanical compression of the heart by large amounts of fluid within the pericardial space. This compression limits the normal range of motion and function of the heart. Medline Plus (Merriam–Webster 2010) (available at http://www.merriamwebster.com/medlineplus).

[T]he effects of this tamponade situation were severe enough that ... it actually perfused the heart muscle where it was so poor that the muscle itself stopped working.

Jamia and her parents (the Hoards) filed professional malpractice actions against Drs. Smith and Goldstein, Roper Hospital, and Karen Johnson, alleging their actions or omissions caused Jamia to experience cardiac arrest, which in turn caused her to suffer brain damage and partial paralysis. All defendants, except Dr. Smith, settled with the Hoards. Dr. Smith moved the trial court for summary judgment, contending no evidence was presented to suggest that his alleged negligence was the proximate cause of Jamia's injury.

The Hoards contended at summary judgment that Jamia's injuries were caused by the improper insertion of the UVC. They additionally asserted Jamia may not have suffered cardiac arrest if Dr. Smith had contacted the nursery after he read the X–rays at 10:34 a.m. or had stated in his written report that the UVC was "malpositioned." Four expert witnesses testified regarding the standard of care applicable to radiologists and neonatologists.

The trial court initially determined the evidence presented a question of fact regarding Dr. Smith's alleged negligence in failing to clearly indicate that the UVC was "malpositioned" or other term of similar import. Summary judgment was granted, however, as the trial court held that "[t]he Plaintiffs' case against Dr. Smith fails because there was no proximate causation between Dr. Smith's alleged negligence and the injury to Jamia Hoard." The Hoards appealed.

On appeal, Jamia's parents asserted: "It is hornbook law that a jury is the judge of the credibility of a witness and may disregard all or part of a witness's testimony." The court of appeals agreed with this position and reversed the grant of summary judgment. We accepted Dr. Smith's petition for certiorari to review the court of appeals decision.

## II.

This case turns on whether there is any evidence that Dr. Smith's alleged negligence was a proximate cause of the injury. The trial court found no evidence that Dr. Smith's alleged failure to act within the established standard of care

proximately caused Jamia's cardiac arrest. The trial court's finding was based on the fact that, approximately fourteen hours before Jamia experienced cardiac arrest, her treating physician, Dr. Goldstein, made a clinical judgment not to reposition the UVC. Dr. Goldstein made this decision well aware that the placement of the UVC was elevated in the atrium, not "optimal" and outside the standard of care.[4]

Dr. Goldstein considered repositioning the UVC, but decided the risks outweighed the potential advantages. Dr. Goldstein was concerned that if he withdrew or repositioned the UVC twenty-two hours after it was placed, withdrawal of the line could dislodge a blood clot and cause additional problems. Moreover, it was Dr. Goldstein's assessment that Jamia was improving and the only indication of a problem with the UVC was Dr. Smith's report.

In reversing the trial court's order, the court of appeals held "a jury could have chosen not to believe Dr. Goldstein's testimony. Simply because testimony is uncontradicted does not render it undisputed." *Hoard,* 377 S.C. at 510, 661 S.E.2d at 117. The court of appeals therefore concluded the trial court had erred in granting summary judgment to Dr. Smith on the question of proximate cause because a jury would be free not to believe Dr. Goldstein.

## A.

### Summary Judgment

Summary judgment is a drastic remedy and should be cautiously invoked so that a litigant will not be improperly deprived of trial on disputed factual issues. *Cunningham ex rel. Grice v. Helping Hands, Inc.,* 352 S.C. 485, 575 S.E.2d 549 (2003). "The purpose of summary judgment is to expedite the disposition of cases which do not require the services of a fact finder." *Singleton v. Sherer,* 377 S.C. 185, 659 S.E.2d 196 (Ct.App.2008). Summary judgment is properly granted when:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

4. Experts testified that the standard of care requires that the UVC generally be placed "above the diaphragm and below the heart," also referred to in the record as the "11 to 13 cm. range."

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Rule 56(c), SCRCP.

■ When reviewing the grant of a summary judgment motion, this court applies the same standard which governs the trial court under Rule 56(c), SCRCP, and summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fleming v. Rose,* 350 S.C. 488, 493, 567 S.E.2d 857, 860 (2002).

## B.

### Proximate Cause

■■ A plaintiff alleging medical malpractice must provide evidence showing: (1) the generally recognized and accepted practices and procedures that would be followed by the average, competent physician in the defendant's field of medicine under the same or similar circumstances, and (2) the defendant departed from the recognized and generally accepted standards. *Jones v. Doe,* 372 S.C. 53, 61, 640 S.E.2d 514, 518 (Ct.App.2006). Additionally, the plaintiff must demonstrate the defendant's departure from such generally recognized practices and procedures proximately caused the plaintiff's alleged injuries and damages. *David v. McLeod Regl. Med. Ctr.,* 367 S.C. 242, 248, 626 S.E.2d 1, 4 (2006).

■ "In a medical malpractice action, it is incumbent on the plaintiff to establish proximate cause as well as the negligence of the physician." *Ellis v. Oliver,* 323 S.C. 121, 125, 473 S.E.2d 793, 795 (1996) (citing *Armstrong v. Weiland,* 267 S.C. 12, 225 S.E.2d 851 (1976)). "When one relies solely upon the opinion of medical experts to establish a causal connection between the alleged negligence and the injury, the experts must, with reasonable certainty, state that in their professional opinion, the injuries complained of most probably resulted from the defendant's negligence." *Id.* at 125, 473 S.E.2d at 795. When expert testimony is the only evidence of proximate cause relied upon, the testimony "must provide a significant causal link between the alleged negligence and the

plaintiff's injuries, rather than a tenuous and hypothetical connection." *Id.* at 125, 473 S.E.2d at 795.

 "Negligence is not actionable unless it is a proximate cause of the injuries, and it may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided." *Hughes v. Children's Clinic, P. A.,* 269 S.C. 389, 398, 237 S.E.2d 753, 757 (1977) (citing *Gunnels v. Roach,* 243 S.C. 248, 133 S.E.2d 757 (1963)).

## III.

In his motion for summary judgment, Dr. Smith presented evidence that Dr. Goldstein read the radiology report and reviewed the X–rays on the afternoon of March 31 and knew the UVC was not optimally placed. It was Dr. Goldstein's judgment that, as described above, removing the UVC presented greater risk to Jamia than leaving it in place. Well aware that the UVC was not optimally placed, Dr. Goldstein made a knowing judgment not to move the line. Fourteen hours later, Jamia experienced cardiac arrest.

The Hoards presented the deposition testimony of several experts. Dr. Anne Hansen, a neonatologist, testified for the Hoards. According to Dr. Hansen, if Dr. Goldstein had repositioned the UVC on March 31, Jamia would have been fine. Dr. Hansen stated that, in her practice, when an X–ray shows the UVC is in the right atrium, "we pull those lines back as soon as we find out and those babies are all fine." Dr. Hansen was asked: "Is there anything in [Dr. Goldstein's] admission note at 2:00 p.m. on the 31st of March that would justify a clinical decision by him to leave the UVC in the position he notes there?" She responded: "No." Hansen testified that Jamia's blood pressure reading at 2:00 p.m. on March 31 indicated there was "no tamponade going on at that point." Dr. Hansen explained:

[T]here was probably slow erosion of the inner wall of the right atrium, but it had not happened to the extent that there was actually erosion through into the pericardial space at this point. So if they had pulled this line out on the 31st at 2:00 p.m., the baby would have been fine.

Dr. Smith correctly contends the record fails to establish that a genuine question of material fact exists regarding whether his alleged failure to act within the standard of care could have been a proximate cause of Jamia's cardiac arrest and subsequent injuries. This is so because the record demonstrates that Dr. Goldstein was aware of the standard of care concerning UVC placement and he made an intentional and independent decision not to move the UVC based on numerous factors. We further observe that Dr. Goldstein had on other occasions moved catheter lines that were not optimally placed.

■■■ The Hoards counter that the court of appeals properly reversed the grant of summary judgment because the evidence established a question of fact regarding the element of proximate cause. In making this argument, they contend it is possible that Dr. Goldstein gave false testimony and did not actually know the standard of care. Therefore, if Dr. Smith had been clearer in his report or had orally communicated his findings, then Dr. Goldstein may have been alerted to the "malposition" of the UVC and may have repositioned it. We reject this "speculative hypothetical." *David v. McLeod Regl. Med. Ctr.*, 367 S.C. 242, 249, 626 S.E.2d 1, 4 (2006) (rejecting "speculative hypothetical[s]" and holding: "In South Carolina, medical malpractice actions require a greater showing than generic allegations and conjecture.").

We turn to the standard relied on by the court of appeals, in which it adopted the Hoards' position that "a jury could have disregarded Dr. Goldstein's testimony and found Dr. Smith's failure to alert Dr. Goldstein of the line's position was a proximate cause of Jamia's injuries. . . . Simply because testimony is uncontradicted does not render it undisputed." *Hoard*, 377 S.C. at 509–10, 661 S.E.2d at 116–17. A jury's prerogative to disregard uncontradicted testimony is a sound principle of law, but it has no application in a summary judgment setting.

■■■ The court of appeals relied upon *Black v. Hodge*, 306 S.C. 196, 198, 410 S.E.2d 595, 596 (Ct.App.1991) and *Ross v. Paddy*, 340 S.C. 428, 434, 532 S.E.2d 612, 615 (Ct.App.2000). In *Black*, the court of appeals affirmed a jury verdict for Respondent Hodge despite Black's contention on appeal that the jury was required to accept her uncontradicted testimony.

306 S.C. at 198, 410 S.E.2d at 596. There, the court of appeals' decision correctly stated that a jury is not required to accept uncontradicted witness testimony, as credibility is a question for the jury. *Id.* Likewise, in *Ross,* on appeal from a jury verdict, the court of appeals found issues concerning witness credibility were properly resolved by the jury. 340 S.C. at 434, 532 S.E.2d at 615. The principle enunciated in *Black* and *Ross* is sound.

■ One may not, however, avoid summary judgment by asserting that a jury may disbelieve uncontradicted evidence. This argument, if accepted, would render summary judgment obsolete, and it is in any event at odds with Rule 56, SCRCP, and our summary judgment jurisprudence:

> [R]ule 56(e), SCRCP, requires that when a motion for summary judgment is made and supported as provided by the rule, an adverse party may not rest upon the mere allegations or denials of his pleadings. The adverse party's response, including affidavits or as otherwise provided by the rule, must set forth specific facts showing there is a genuine issue for trial.

*SSI Med. Servs., Inc. v. Cox,* 301 S.C. 493, 497, 392 S.E.2d 789, 792 (1990); *see also Doe v. Batson,* 345 S.C. 316, 321, 548 S.E.2d 854, 856 (2001) (explaining that "a party opposing summary judgment [must] come forward with affidavits or other supporting documents demonstrating the existence of a genuine issue for trial").

A plaintiff cannot create a genuine issue of material fact with the argument that the jury does not have to believe a witness. A party defeats summary judgment by affirmatively demonstrating the presence of a genuine issue of material fact. As Rule 56(e), SCRCP, states, a party "may not rest upon the mere allegations or denials of his pleading[s]."

In response to Dr. Smith's evidence that his alleged breach of the standard of care was not a proximate cause of Jamia's injury, the Hoards could rely on neither speculation nor the suggestion that a jury may ultimately find Dr. Goldstein not believable to create a genuine issue of material fact. We find the Hoards failed to produce any evidence that Dr. Smith's alleged negligence was a proximate cause of Jamia's injuries.

## IV.

We reverse the decision of the court of appeals and reinstate the trial court's order granting Dr. Smith summary judgment.

**REVERSED.**

TOAL, C.J., PLEICONES, BEATTY and HEARN, JJ., concur.